**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| WORLD COMMERCE SERVICES, LLC D/B/A WLG USA, LLC, an Illinois Corporation AND WLG, INC., a Delaware Corporation, <br><br> Plaintiffs, <br><br> v. <br><br> SCOTT TURNER, JOANNE REICHERTER, JOANNE ZAMBUTO, USA LOGISTICS, S.J. STILE ASSOCIATES, LTD, a New York corporation, <br><br> Defendants. | Civil Action <br><br> **VERIFIED COMPLAINT** |

Plaintiffs World Commerce Services, LLC d/b/a WLG USA, LLC ("WLG USA"), an

Illinois corporation and WLG, Inc. ("WLG") a Delaware Corporation (WLG USA and WLG

may sometimes be collectively referred to as "plaintiffs" or "WLG"), by way of Verified

Complaint against the defendants Scott Turner, Joanne Reicherter, Joanne Zambuto (Turner,

Reicherter and Zambuto may sometimes be collectively referred to as "Individual Defendants")

USA Logistics and S.J. Stile Associates, LTD ("Stile Associates") (the Individual Defendants,

USA Logistics and Stile Associates may sometimes be collectively referred to as "defendants")

allege as follows:

### Nature of the Action

1.      This action seeks damages and injunctive and equitable relief to enjoin the former

President of plaintiffs' New York branch office, defendant Scott Turner, and its former

employees, defendants Joanne Reicherter and Joanne Zambuto, from intentionally violating the

express terms of their employment agreements and engaging in unlawful competition.

2.      Plaintiffs further seek an order enjoining defendants from continuing their tortious conduct. As set forth herein, defendants have engaged in a pattern of deceptive and illegal conduct, including commercially disparaging WLG; unlawfully soliciting its customers and/or employees; and misappropriating WLG's confidential and proprietary information for defendants' own personal gain.

3.      As more fully set forth below, WLG is an international logistics company that provides air and ocean freight-forwarding, contract logistics, customs brokerage and other supply chain management services to its customers from its offices in the United States, the United Kingdom, Hong Kong, the People's Republic of China and Australia. WLG's customers include an international network of cargo agents that not only support WLG's freight-forwarding and related logistics service needs but also serves as an important sales and marketing resource for WLG through which it receives increased business.

4.      Until March 4, 2011, the Individual Defendants were employed with WLG under employment agreements that prohibited them from, among other things, disclosing WLG's confidential information and trade secrets, including its customer lists and pricing information, soliciting its customers and employees and engaging in unlawful competition.

5.      After the termination of their employment, the Individual Defendants began working for USA Logistics and/or Stile Associates in direct competition with WLG. Defendants' unlawful conduct includes disparaging WLG and attempting to divert its business opportunities, clients and employees. For example, upon information and belief, defendants have contacted WLG's customers to solicit their business, stating:

- WLG was going bankrupt and would leave its customers and their shipments in limbo.

- Stile Associates had hired WLG's former employees and could immediately pick-up and service WLG's customers without interruption at rates lower than those charged by WLG.

Defendants made those statements despite knowing that they were false and despite knowing that such conduct is unlawful and violates the Individual Defendants' employment agreements.

6.     Turner also solicited an employee from WLG's New York branch office. In doing so, Turner had this to say:

- I got office x u will get same pay or better deal. All ready on Monday. Think about it. Milton is backing.

- The ship is sinking do you have a lifejacket?

- Last chance to join us. Don't be silly and stay.

- Jilling left too. WLG hasn't paid anyone overseas. Big problems. If u need us call b 4 too late x u have no job.

- Traitor. How do u live with yourself.

Turner solicited WLG's employee and made false statements to him knowing that they were false and despite knowing that such conduct is unlawful and violates his employment agreement.

7.     WLG seeks to enforce the employment agreements it has with the Individual Defendants and prevent all defendants from continuing their tortious conduct.

### Parties, Jurisdiction and Venue

8.     Plaintiff World Commerce Services, LLC d/b/a WLG USA, LLC is an Illinois limited liability corporation headquartered in Schaumburg, Illinois. It has branch offices throughout the United States, including New York.

9.      Plaintiff WLG Inc. is a Delaware corporation headquartered in Schaumburg, Illinois.

10.     Through its family of businesses, WLG conducts its freight-forwarding and logistics business internationally and throughout the United States, including New York. Its customer base included direct shippers and importers with diverse customer operations across a wide range of industries, including textile and apparel retailers, consumer goods, furniture, industrial machinery, computer and electronic equipment and printed materials.

11.     Upon information and belief, defendant Turner resides at 15 Caumsett Farms Lane, Woodbury, New York; he conducts business at 181 S. Franklin Avenue, Valley Stream, New York 11581 on behalf of USA Logistics and/or Stile Associates. According to its website, Stile Associates provides freight-forwarding and logistics services worldwide and throughout the United States, including New York.

12.     Upon information and belief, defendant Joanne Reicherter resides at 627 Bayview Avenue, Freeport, New York 11520 and is employed by and/or conducts business on behalf of USA Logistics and/or Stiles Associates at 181 S. Franklin Avenue, Valley Stream, New York 11581.

13.     Upon information and belief, defendant Joanne Zambuto resides at 627 Bayview Avenue, Freeport, New York 11520, and is employed by and/or conducts business on behalf of USA Logistics and/or Stiles Associates at 181 S. Franklin Avenue, Valley Stream, New York 11581.

14.     Defendant USA Logistics, upon information and belief, conducts business at 181 S. Franklin Avenue, Valley Stream, New York 11581.

15.     Defendant S.J. Stile Associates, Ltd is a New York Corporation; upon information and belief it conducts business at 181 S. Franklin Avenue, Valley Stream, New York 11581.

16.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the controversy between plaintiffs and defendants involves a federal question over which this Court has original jurisdiction. Jurisdiction is also proper pursuant 28 U.S.C. § 1332 because the action is between citizens of different states and the value of the amount in controversy exceeds $75,000, exclusive of attorney' fees, costs and interest.

17.     Personal jurisdiction is proper in New York because, at all times material hereto, defendants operated, conducted, engaged in, or carried on a business or business venture in this state, there is the requisite nexus between the business and this action and because defendants engage in substantial and not isolated activity within New York.

18.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(3) because, at all times material hereto, a substantial portion of the events giving rise to this action arose in this judicial district and because defendants reside in and/or conduct business in this judicial district.

## Factual Allegations

### A.     WLG and its Business

19.     WLG is a freight-forwarding and logistics service provider that offers a suite of services, including distribution, warehousing, customs brokerage services and other value added services ("VAS") such as warehousing, scanning, pick and pack, inventory tracking, labeling and related activities. With many offices strategically located in venues worldwide, including New York, WLG arranges freight-forwarding, VAS and logistics services for thousands of transactions each year and is trusted by its customers and cargo agents.

20.    WLG does not own or operate any transportation assets such as aircraft, ships or railroads.   Rather, WLG contracts with companies owning those types of assets to provide transportation and logistics services required for shipping freight on behalf of WLG's customers.

21.    Much of WLG's work is performed in conjunction with its network of overseas cargo agents.   The cargo agents collect freight on WLG's behalf for shipments routed to the designated location; arrange local delivery of the goods; provides break-bulk services (i.e., consolidation and deconsolidation) for various shipments and also customs clearance; and provide sales and marketing support.   On behalf of their cargo agents, WLG arranges for shipments of cargo from the point of origin to the point of destination; provides local pick-up and transshipment services from point of origin to the consignee; provides break-bulk services for some shipments and also customs clearance and local delivery of goods; and provides warehousing, storage and VAS.

22.    WLG has expended substantial amounts of time and money to build its global business and develop relationships with its customers and cargo agents.   Such expenditures include significant amounts of money for WLG's sales force, including Turner, to cultivate and maintain customer and agent relationships, contacts and industry affiliations.

23.    WLG also invests substantial resources in developing and training its employees, including defendant Turner.   In fact, his knowledge, experience and business contacts in the current marketplace of the freight-forwarding and logistics service industry came at the expense of and through his employment with WLG.

24.    Turner began working for WLG in May 2009 as the President of its New York branch office ("NYO"); Joanne Reicherter began working for WLG in May 2009 as a customer service representative in the NYO; and Joanne Zambuto began working for WLG in October

2009, as an accounting specialist in the NYO. The Individual Defendants had substantial interactions with WLG's customers, agents and employees during the Individual Defendants' employment with WLG.

25.     While the Individual Defendants were expected to generate and service WLG's freight-forwarding and logistics service business in New York, their responsibilities ultimately required them to develop and service business for WLG's international customers. Turner's sales duties were essential to WLG's business development, marketing and operations of the NYO.

26.     Over the course of their employment with WLG, the Individual Defendants were entrusted with important and sensitive confidential and proprietary information and trade secrets of WLG's business.

27.     The Individual Defendants became intimately familiar with highly confidential and trade secret information of WLG, including confidential and difficult to develop information about WLG's customers, prospective customers, cargo agents and their purchasing and pricing histories and other operations; WLG's business development plans, price structures and costs; the terms of WLG's agreements with their customers and cargo agents; and WLG's internal operations and marketplace strategies for competing with other freight-forwarding companies and logistic support services businesses. This information derives economic value from not being generally known and is the subject of reasonable efforts to maintain its confidentiality by, among other means, requiring employees to execute confidentiality agreements such as the agreements executed by the Individual Defendants.

**B.     Turner' Employment Agreements**

28.     On May 1, 2009, WLG and Turner entered into an Employment Agreement ("Turner Agreement"). A copy of the agreement is annexed hereto as Exhibit A. Turner's employment under the Agreement was to continue until December 31, 2014, unless terminated sooner by either party pursuant to the agreement.

29.     The Turner Agreement contains covenants of non-competition and non-solicitation expressly prohibiting Turner from directly or indirectly participating in any business that offers products or services competitive to those offered by WLG and from contacting WLG's clients, customers or business contacts, independent contractors or employees for a limited period of time following the termination of his employment with WLG. Exhibit A, Agreement at ¶ 9. In particular, the Agreement provides:

> 9.1     The Executive acknowledges that the WLG Group has invested substantial time, money and resources in the development of its Inventions, Confidential Information (including trade secrets), customers, accounts and business partners, and further acknowledges that during the course of the Executive's employment with the Company the Executive will have access to the WLG Group's Inventions and Confidential Information (including trade secrets) and will be introduced to existing and prospective customers, accounts and business partners of the Company....
>
> 9.2     In recognition of the foregoing, the Executive covenants and agrees that:
>
> (a)     During the term and for a period of [12 months] thereafter, the Executive may not, without the prior written consent of the Board (whether as an employee, agent, owner, partner, consultant, independent contractor, representative, stockholder or in any other capacity whatsoever) participate in any business that offers products or services competitive in any way to those offered by the WLG Group or that were under active development the WLG Group during the Term....
>
> (b)     During the term, and for a period of [18 months] thereafter, the Executive may not entice, solicit or encourage any WLG Group employees to leave the employee of the WLG Group or any independent contractor to sever its engagement with the WLG Group, absent the express or prior written consent to do so from the Board.

(c)   During the term, and for a period of [18 months] thereafter, the Executive may not, directly or indirectly, entice, solicit or encourage any current or prior customer or prospective customer of the WLG Group to cease doing business with the WLG Group, reduce its relationship with the WLG Group, refrain from establishing or expanding a relationship with the WLG Group or do any business with any other entity.

* * *

Exhibit A, Agreement at ¶ 4.

30.   The Agreement also prohibits Turner from disclosing WLG's confidential information and trade secrets.   Confidential information is defined under the agreement as follows:

> Information relating to the WLG Group's business affairs, customers, proprietary technology, trade secrets, patented processes, research and development data, know-how, market studies and forecasts, competitive analyses, pricing policies, employee lists, employment agreements (other than this Agreement), personnel policies, the substance of agreements with customers, suppliers and others, marketing arrangements, customer lists, commercial arrangements, or any other information relating to the WLG Group's business that is not generally known to the public or to actual or potential competitors of the WLG Group (other than through a breach of this Agreement).  This obligation shall continue ... regardless of whether the Executive continues to be employed by the Company.

Exhibit A, Turner Agreement at ¶ 7.

31.   With respect to the prohibition against improperly using or disclosing confidential information, the agreements provide, in relevant part, that:

> The Executive acknowledges that the WLG Group has invested substantial time, money and resources in the development and retention of its Inventions, Confidential Information (including trade secrets), customers, accounts and business partners, and further acknowledges that during the course of the Executive's employment with the Company the Executive will have access to the WLG Group's Inventions and Confidential Information (including trade secrets) and will be introduced to existing and prospective customers, accounts and business partners of the Company.  The Executive acknowledges and agrees that any and all "goodwill" associated with any existing or prospective customer, account or business partner belongs exclusively to the

- 9 -

> WLG Group, including, but not limited to, any goodwill created as
> a result of direct or indirect contacts or relationships between the
> Executive and any existing or prospective customers, accounts or
> business partners....

Exhibit A, Turner Agreement at ¶ 9.1.

32.    The Turner Agreement expressly requires Turner to return all WLG materials and

documents, including customer lists, in his possession to WLG at the termination of his

employment. Exhibit A, Turner Agreement at ¶ 7.2.

33.    The parties to the agreement also recognized that injunctive relief might be

necessary in the event of a breach or threatened breach of the Agreements.  Exhibit A, Turner

Agreement at ¶ 10.

**C.    Reicherter's and Zambuto's Employment Agreements**

34.    On May 1, 2009, WLG and Reicherter entered into an Employment Agreement

("Reicherter Agreement").   A copy of the Agreement is annexed hereto as Exhibit **B**.

Reicherter's employment under the Agreement was at-will. Exhibit B at ¶ 10.

35.    On October 12, 2009, WLG and Zambuto entered into an Employment

Agreement ("Zambuto Agreement"). A copy of the Agreement is annexed hereto as Exhibit C.

Zambuto's employment under the Agreement was at-will. Exhibit C at ¶¶ 5, 10.

36.    The Reicherter and Zambuto Agreements contain non-solicitation covenants

expressly prohibiting Reicherter and Zambuto from directly or indirectly soliciting WLG's

customers, cargo agents or employees for a specified period of time following the termination of

their employment with WLG.  Exhibit **B**, Reicherter Agreement at ¶ 7; Exhibit C, Zambuto

Agreement at ¶ 7.  The Reicherter Agreement provides:

> Employee agrees that during his or her employment at Company
> and for a period of [3 years] thereafter, he or she will not, directly
> or indirectly: (a) solicit any of Company's U.S. customers or
> overseas agents for freight forwarding business; (b) disclose the

names of any such customers or overseas agents to any other person or entity; or (c) hire or solicit or attempt to persuade any of the employees of Company to leave the employ of Company or otherwise interfere with the performance of their duties for Company.

Exhibit B, Reichenter Agreement at ¶ 7. The Zambuto Agreement provides:

Employee agrees that during his or her employment at Company and for a period of [2 years] thereafter, he or she will not, directly or indirectly: (a) solicit or accept business from any of Company's or its affiliates' U.S. customers or overseas agents with whom Employee conducted business on behalf of the Company or its affiliates or about which Employee acquired confidential information, for freight forwarding business and/or United States customs brokerage, logistics, and/or non-vessel operating common carrier services; (b) solicit or accept business from any of the Company's or its affiliates' prospective customers but only if such prospective customers received an offer or proposal from the Company and/or its affiliates that Employee worked on, provided assistance to or had access to confidential information regarding, during the last [12 months] of his/her employment; (c) use or disclose the names of any of the Company's or its affiliates' customers or overseas agents to any other person or entity; or (d) hire or solicit or attempt to persuade any of the employees of Company or its affiliates to leave the employ of Company or its affiliates or otherwise interfere with the performance of their duties for Company or its affiliates; (e) solicit or attempt to solicit any customer, supplier, vendor, or contractor of Company and/or its affiliates, to terminate or disturb their relationships or business with the Company and/or its affiliates.

Exhibit C, Zambuto Agreement at ¶ 8.

37.    The Reichenter and Zambuto Agreements also prohibit Reichenter and Zambuto from disclosing WLG's confidential information and trade secrets.    Exhibit B, Reichenter Agreement at ¶ 6; Exhibit C, Zambuto Agreement at ¶ 6.  Confidential information is defined under the Agreements to include, but not be limited to:

existing and contemplated services, products, business methods, practices and plans, pricing, costs, margins, selling techniques, methods of obtaining customers, credit and financial data of suppliers, and the identities, business needs and preferences of [WLG's] present and

prospective customers, suppliers and overseas agents.  It is understood by and between the parties to this Agreement that such confidential information and trade secrets have been developed by [WLG] over a number of years at great expense, are not readily available to or ascertainable by and between the parties to this Agreement that such confidential information and trade secrets have been developed by [WLG] over a number of years at great expense, are not readily available to or ascertainable by the freight forwarding industry generally, and have been kept secret and divulged to employees only on a need-to-know basis.

Exhibit B, Reicherter Agreement at ¶ 3; Exhibit C, Zambuto Agreement at ¶ 3.

38.    The Reicherter and Zambuto Agreements also contain an express requirement that Reicherter and Zambuto return all WLG materials and documents, including customer lists, in their possession to WLG at the termination of their employment.  Exhibits B and C, Agreements at ¶ 2.

39.    The parties to the Agreements also recognized that injunctive relief might be necessary in the event of a breach or threatened breach of the Agreements.   Accordingly, paragraph 9 of the Agreements provides:

> In the event of a breach or a threatened or intended breach of [the covenants herein] by Employee, [WLG] shall be entitled to remedies otherwise available … at law or in equity, to injunctions, both preliminary and final, enjoining and restraining such breach or threatened or intended breach, and Employee hereby consents to the issuance therefore forthwith in any court of competent jurisdiction.  In the event [WLG] shall successfully enforce any part of this Agreement through legal proceedings, Employee agrees to pay to [WLG] all costs and attorneys' fees reasonably incurred by [WLG] in connection therewith.

Exhibit B,  Reicherter Agreement at ¶ 9; Exhibit C, Zambuto Agreement ¶ 9.

**D.    Defendants' Unlawful Activities**

40.    The Individuals Defendants' employment with WLG terminated on March 4, 2011 but, before the close of business that very same day, the Individual Defendants had already arranged to engage in direct competition with WLG and solicit WLG's customers, agents and

employees. The Individual Defendants did so through their employment with USA Logistics and/or Stiles Associates.

41.    Turner confirmed his engagement in competitive employment with USA Logistics and/or Stile Associates when he sought to solicit the Branch Manager of WLG's New York Office, Allen Quinn, via text message at 2:05 p.m. on March 4, 2011:

> I got office x u will get same pay or better deal. All ready on Monday. Think about it. **Milton is backing.**

A copy of the March 4, 2011 text message is attached hereto as Exhibit D. Emphasis supplied.

42.    Additionally, in an email exchange with Exquisite Apparel, one of WLG's customers that Turner had tried to solicit on March 29, 2011, Turner identified himself as President of USA Logistics. He sent the email from an email address provided to him by Stile Associates: scott@stileintl.com. The signature line on his email indicates that USA Logistics is located at the same physical address (181 South Franklin Avenue, 4th Floor, Valley Stream, New York ) as well as the same electronic Internet address (www.stileintl.com) as Stile Associates. Milton Heid who, upon information and belief is affiliated with Stile Associates, was copied on the email. A copy of which is attached hereto as Exhibit F.

43.    When WLG learned of the Individual Defendants' conduct, WLG's counsel sent cease-and-desist letters to the Individual Defendants reminding them that their conduct violated the post-employment restrictions contained in their employment agreements. A copy of the cease and desist letters is attached collectively as Exhibits G. In response, the Individual Defendants did not deny the accusation of wrongdoing contained in the cease and desist letters. Rather, they had their attorneys contact WLG's counsel under the pretense of trying to amicably resolve the disputes between the parties.

44.    Concomitantly, and unbeknownst to WLG, defendants engaged in a campaign to commercially disparage WLG and solicit its customers, cargo agents and employees.

45.    On or about April 12, 2011, Steven Heid of Stiles Associates called WLG customer High Five Products ("High Five") to solicit its customs and freight forwarding business.  In an attempt to persuade the customer to use Stile Associates for customs brokerage and freight-forwarding, Mr. Heid told High Five:

- several employees of WLG had left the company and it "was in financial stress";

- organizations were no longer doing business with WLG because it was past due on its bills; and

- the WLG account representative who had handled High Five Products' account was now working with Stile Associates.

Stile Associates followed-up the call with a solicitation email, a copy of which is attached hereto as Exhibit G.

46.    Stile Associates made similar calls to induce other WLG customers, including Ventlab and OCI Forwarding to transfer their customs brokerage and freight-forwarding business to Stile Associates by telling the WLG customers that WLG was in financial distress and several employees had left the company.

47.    The Individual Defendants have also solicited WLG's customers.  For example, on April 13, 2011, Turner emailed WLG customer Exquisite Apparel about rates for freight-forwarding from Shanghai to Los Angeles and New York.  Turner sent the email from his Stile Associates email address.  Reicherter and Zambuto were copied on the email as was Milton Heid.  A copy of the April 13, 2011 email is attached hereto as Exhibit H.  The freight-

forwarding rates that Turner offered to Exquisite Apparel on April 13, 2011, were either the same or lower than those rates charged by WLG.

48.     To facilitate their unlawful solicitation, the Individual Defendants disclosed their knowledge of WLG's pricing information and its customer and business relationships to defendants for their own personal gain. For example, Turner traded on his knowledge of WLG's pricing information and his willingness to undercut it in his email exchange with Exquisite Apparel when he tried to solicit its customs brokerage and freight-forwarding business on behalf of USA Logistics and Stile Associates.

49.     Turner's unlawful misappropriation and disclosure of WLG's confidential information is further evidenced by his March 30, 2011 email to and ensuing exchange with Exquisite Apparel, Exhibit E, where Turner plainly states that he knew that his rates would beat the rates Exquisite Apparel paid to WLG:

> **From:**                                         █████ @exquisiteapparel.com
> **Sent:**     Friday,     April     01,     2011     2:33     PM
> **To:**     Allen     Quinn     -     WLG     -     New     York
> **Subject:** RE: Chennai Rates
>
> **FYI**
>
> **Allen - I know you will do better on rates!**
>
> **From:**                                         ████████████████████
> **Sent:**     Friday,     April     01,     2011     2:12     PM
> **To:**                                                                     'Scott'
> **Subject:** RE: Chennai Rates
> **WLG rates have dropped and I'm awaiting rates from 6 other**
> **forwarders.**
>
> **Thanks,**
> ██
>
> **From:**              Scott              [mailto:Scott@stileintl.com]
> **Sent:**     Friday,     April     01,     2011     12:26     PM
> **To:**                                         ████████████████████
> **Subject:** RE: Chennai Rates
> Hi

Thank You !!

I will be providing you Shanghai rates next week..

I have rates from Hanjin and i think we can save you about 100- 200 per container  from what you were paying WLG...
Also I will give you rates from POS and Matson..I am positive there will be substantial savings too!!

 Have a nice weekend !!
Best Rgds
Scott

| | | | | | | |
|---|---|---|---|---|---|---|
| **From:** | | | ████ @exquisiteapparel.com | | | |
| **Sent:** | Friday, | April | 01, | 2011 | 12:09 | PM |
| **To:** | | | | | | Scott |
| **Subject:** RE: Chennai Rates | | | | | | |

Scott,

████  advised that you called.  We are looking at the rates and we have good rates
from a lot of forwarders.  Please give me a chance to get back to you by the last
week of April.


**Regards,**

████

| | | | | | | |
|---|---|---|---|---|---|---|
| **From:** | Scott | | | [mailto:Scott@stileintl.com] | | |
| **Sent:** | Wednesday, | March | 30, | 2011 | 9:21 | AM |
| **To:** | | | ████████████████ | | | |
| **Cc:** | | Milton | | | | Heid |
| **Subject:** Chennai Rates | | | | | | |

Hi ████

Thank you for taking the time to meet us yesterday

I have checked with overseas and I am pleased to offer you ocean rates from Chennai to Lax



- 16 -

███████████

I am working on the Shanghai rates and will revert to you next week!

Did you need any other ports in India ?
Did you need rates from Bangladesh?

Thank you again

Rgds
Scott

Scott Turner
President of USA Logistics
181. South Franklin Ave, 4th Floor
Valley Stream, NY 11581
Email :Scott@stileintl.com
Phone:516-394-2126
www.stileintl.com

Exhibit ____.

50.    Upon information and belief, Turner was able to contact Exquisite Apparel and offer it rates lower than those offered by WLG because Turner possessed confidential information about WLG's client lists and pricing information and because Turner had gained knowledge of and developed relationships with WLG's network of cargo agents, which permits him to offer more lucrative terms of engagement to WLG's cargo agents to transition the unlawfully solicited customers without service interruptions.

51.    By converting WLG's confidential information, including customer lists and pricing information, defendants have solicited WLG's customers and offered the very same services at a price lower than what WLG charged its customers while simultaneously making knowingly false statements about WLG's financial condition and employees.

52.    Defendants unlawful conduct not only caused WLG to reduce its rates to salvage its customer relationships, as requested to do by Exquisite Apparel in response to defendants' unlawful solicitation, their conduct has also caused WLG to expend substantial time, effort and money to repair and strengthen its customer relationships.

53.     Defendants conduct also violates the non-solicitation and non-disclosure provisions of the Individual Defendants' employment agreements and the non-competition provision of Turner's employment agreement.

54.     When Plaintiffs learned of defendants' unlawful conduct and the employment of the Individual Defendants with USA Logistics and/or Stile Associates, WLG's counsel sent cease-and-desist letters to USA Logistics and Stile Associates, demanding that they cease their tortious conduct and notifying them that their employment relationship with the Individual Defendants violated the non-compete, non-disclosure and non-solicitation provisions of their employment agreements with WLG.

55.     Defendants did not deny the accusation of wrongdoing contained in the cease and desist letters.

56.     Accordingly, WLG seeks the assistance of the equitable powers of this Court to enjoin defendants from making, publishing and/or transmitting statements that are knowingly false, made in reckless disregard for truth or falsity or intended by defendants to result in harm to WLG, about the nature, characteristics and/or quality of its services, in advertising and other oral and written communications directed to WLG's existing and potential customers, overseas agents, employees and others.   WLG also seeks equitable relief to prevent the Individual Defendants from continuing to breach their employment agreements with WLG; to prevent misappropriation of its confidential information and trade secrets; and to enjoin the unjustified and wholesale interference with WLG's prospective or existing business relationships with its customers and business contacts.

57.     If defendants' conduct is allowed to proceed unchecked, WLG's confidential information and trade secrets will be disclosed, and its advantageous business relationships with its customers, potential customers and business contacts will be lost and destroyed.

58.     WLG has no adequate remedy at law to protect itself from this unlawful and unfair competition.

59.     WLG has retained the undersigned attorneys to bring this suit and have agreed to pay them reasonable attorneys' fees and costs.   Should WLG enforce the agreements in this action, they are entitled to recover their attorneys' fees and costs against the Individual Defendants, pursuant to the Agreements.  Exhibit A,  Turner Agreement at ¶ 16; Exhibit B, Reichelter Agreement ¶ 9; Exhibit C,  Zambuto Agreement at ¶ 9.

60.     WLG has performed each of its obligations under the agreements and all conditions precedent to its claims and causes of action have been performed, waived or have occurred.

61.     As to each item of relief sought, greater injury will be inflicted upon WLG by the denial thereof than will be inflicted upon defendants by the granting of such relief.  In fact, inasmuch as WLG demands only that defendants be restrained from committing unlawful acts, no injury can result from the granting of the relief demanded herein.

62.     No previous application for the relief requested herein, or any similar relief, has been made to this or any other court by WLG against these defendants.

## Count I

### False Advertising/Violation of §43(a) of the Lanham Act

### (WLG v. Stile Associates)

63.    WLG repeats and incorporates the allegations of the foregoing paragraphs of this

Complaint as if set forth herein at length.

64.    Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), provides, in relevant part,

as follows:

> (1) Any person who, on or in connection with any goods or
> services, or any container for goods, uses in commerce any word,
> term, name, symbol, or device, or any combination thereof, or any
> false designation of origin, false or misleading description of fact,
> or false or misleading representation of fact, which –
>
> (A) is likely to cause confusion, or to cause mistake, or to
> deceive as to the affiliation, connection, or association of such
> person with another person, or as to the origin, sponsorship, or
> approval of his or her goods, services, or commercial activities by
> another person, or
>
> (B) in commercial advertising or promotion, misrepresents
> the nature, characteristics, qualities, or geographic origin of his or
> her or another person's goods, services, or commercial activities
> shall be liable in a civil action by any person who believes that he
> or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a).

65.    Stile Associates is in commercial competition in the market for freight-forwarding

and logistics services.

66.    As part of an organized campaign to influence WLG's customers to buy Stile

Associates' services, Stile Associates, through its agents, servants and employees, has made false

and misleading statements to WLG's customers and potential customers regarding the freight-

forwarding and logistic services offered by WLG and Stile Associates.

67.     Stile Associates has falsely advised WLG's customers and potential customers that WLG "is in financial stress" and that its employees are fleeing the company.

68.     Stile Associates' false and misleading statements violate Section 43 of the Lanham Act.

69.     Stile Associates' false and misleading statements have deceived and/or have a tendency to deceive WLG's customers and potential customers and the public in general.

70.     Stile Associates' false and misleading statements are material because they are likely to influence the purchasing decisions of customers and potential customers of WLG's services.

71.     Stile Associates' actions were intentionally and deliberately undertaken for the purpose of causing confusion, mistake and deception, and for the purpose of enabling Stile Associates to profit unfairly and at the expense of WLG.

72.     Stile Associates advertised services traveled in interstate commerce.

73.     Stile Associates' false advertising has proximately caused and/or has the likelihood of resulting in damage to WLG, including the loss of its customers and potential customers, declining sales and income and damage to business reputation and good will and other damages.  Unless Stile Associates is restrained and enjoined from such false advertising, WLG will suffer immediate and irreparable injury and harm for which there is no adequate remedy at law.

## Count II

### Slander *Per Se*

### (WLG v. Turner, USA Logistics and Stile Associates)

74.     WLG repeats and incorporates the allegations of the foregoing paragraphs of this Complaint as if set forth herein at length.

75.     Turner, USA Logistics, its agents, servants and/or employees and Stile Associates, its agents, servants and/or employees (collectively, the "Slander Defendants") have made, published and transmitted statements that were knowingly false, made in reckless disregard for truth or falsity, or intended by them to result in harm to WLG, about the nature, characteristics and quality of WLG's freight-forwarding and logistics services, in advertising and other oral and written communications directed to WLG's existing and potential customers, employees and others. This conduct was undertaken by the Slander Defendants with the intent of prejudicing WLG in the conduct of its business and to deter others from dealing with WLG.

76.     The Slander Defendants did not enjoy any privilege to make false, misleading and/or disparaging statements about WLG or its services.

77.     The Slander Defendants made their false and misleading statements concerning WLG's freight-forwarding and logistics services with the specific intent to harm WLG.

78.     WLG has suffered damages as the result of the false, misleading and disparaging statements made by the Slander Defendants about WLG's freight-forwarding and logistics services.

## Count III

**Tortious Interference with Contracts/Business Relations/Prospective Economic Advantage**

**(WLG v. All Defendants)**

79.     WLG repeats and incorporates the allegations of the foregoing paragraphs of this Complaint as if set forth herein at length.

80.     WLG had employment agreements with the Individual Defendants under which WLG has certain rights and the Individual Defendants have certain obligations. USA Logistics and Stile Associates had knowledge of the existence of the employment agreements and WLG's rights and the Individual Defendants' obligations as described above.

81.     Despite such knowledge, USA Logistics and Stile Associates deceitfully, maliciously, intentionally and unjustifiably interfered with the Individual Defendants' employment agreements by, among other things, causing the Individual Defendants to accept and/or continue employment with USA Logistics and Stile Associates in violation of their contractual obligations.

82.     WLG was and is in pursuit of business from its existing and potential customers and business contacts to provide freight-forwarding and logistics services, and therefore, had and has a reasonable expectation of prospective economic advantage with respect to those customers.

83.     At all times relevant to this Complaint, defendants knew or should have known of WLG's existing and prospective advantageous business relationships with its customers, prospective customers and business contacts, including those whom the Individual Defendants serviced and managed while employed by WLG.

84.     The defendants have wrongfully, knowingly, intentionally and without justification interfered with WLG's existing and prospective advantageous business relationships.

85.     Defendants' interference with advantageous business relationships was/is malicious, intentional and unjustified.

86.     As a result of defendants' conduct, WLG has lost prospective gain.

87.     The defendants' conduct has proximately caused and will proximately result in damage to WLG.

88.     Unless defendants are restrained and enjoined from continuing to unlawfully interfere with WLG's contracts, existing and prospective customers and business contacts, WLG will suffer irreparable harm for which there is no adequate remedy at law.

## Count IV

### Misappropriation of Trade Secrets

### (WLG v. All Defendants)

89.     WLG repeats and incorporates the allegations of the foregoing paragraphs of this Complaint as if set forth herein at length.

90.     The Individual Defendants were and are under a duty to WLG not to use or disclose its confidential and proprietary information and trade secrets, which were made available to the Individual Defendants during their employment with WLG.

91.     Without authorization from WLG, defendants have wrongfully misappropriated, retained, used and disclosed WLG's confidential and proprietary information and trade secrets, including its customer lists and pricing information, in violation of applicable law. If not restrained, defendants will continue these unlawful actions.

- 24 -

92.     Defendants' actions constitute misappropriation of WLG's confidential information and trade secrets.

93.     Defendants' misappropriation of WLG's confidential information and trade secrets has proximately resulted, and will proximately result, in damage to WLG.

94.     As a result of defendants' misappropriation of confidential information and trade secrets, WLG has suffered and will continue to suffer irreparable harm.   If defendants are allowed to continue to misappropriate WLG's confidential information and trade secrets, WLG will suffer further irreparable harm for which there is no adequate remedy at law.

<u>Count V</u>

**Breach of Contract**

**(WLG v. The Individual Defendants)**

95.     WLG repeats and incorporates the allegations of the foregoing paragraphs of this Complaint as if set forth herein at length.

96.     The Individual Defendants knowingly and voluntarily entered into legally binding and enforceable employment agreements with WLG for which they received consideration.

97.     The employment agreements entered into by the Individual Defendants contained restrictions against the use and disclosure of WLG's confidential information, including its customer lists, pricing information and trade secrets, which restrictions survived the termination of the Individual Defendants' employment with WLG.

98.     Under the employment agreements entered into by the Individual Defendants, the Individual Defendants agreed not to disclose WLG's confidential information and trade secrets.

99.     The Individual Defendants have breached their contractual obligations by disclosing and using WLG's confidential information and trade secrets, including WLG's customer lists and pricing information, without authorization from WLG.

100.    The Individual Defendants have also breached their agreement to return any and all copies of WLG's confidential information and trade secrets, including customer lists and pricing information.

101.    The Individual Defendants' breaches have proximately caused and will proximately result in damage to WLG.

102.    Unless the Individual Defendants are restrained and enjoined from further breaching their contractual obligations, WLG will suffer irreparable injury and harm for which there is no adequate remedy at law.

## Count VI

### Breach of Contract

### (WLG v. Reicherter & Zambuto)

103.    WLG repeats and incorporates the allegations of the foregoing paragraphs of this Complaint as if set forth herein at length.

104.    Reicherter and Zambuto knowingly and voluntarily entered into legally binding and enforceable employment agreements with WLG for which Reicherter & Zambuto received consideration.

105.    As described above, Reicherter and Zambuto breached their employment agreements by failing to abide by the covenant of non-solicitation and confidentiality provisions of the agreement by disclosing WLG's confidential information in the course of their employment with USA Logistics and/or Stile Associates and permit them to solicit WLG's

customers and business contacts before the expiration of the restrictive covenants of the agreement. By way of example, defendant Reicherter disclosed to Stile Associates that she had handled the accounting for WLG's customer, High Five Products. To induce High Five to transfer its business to Stile Associates, it told High Five's operations manager that Reicherter was now employed with Stile Associates.

106. WLG has complied with all conditions precedent under the agreements.

107. As a proximate result of Reicherter's and Zambuto's breach of the agreement, WLG has suffered actual damages in an amount to be proven at trial.

108. WLG has also suffered and will continue to suffer irreparable injuries and harm unless Turner is enjoined from the wrongful conduct described above.

## Count VII

### Breach of Contract

### (WLG v. Turner)

109. WLG repeats and incorporates the allegations of the foregoing paragraphs of this Complaint as if set forth herein at length.

110. Turner knowingly and voluntarily entered into a legally binding and enforceable employment agreement with WLG for which Turner received consideration.

111. As described above, Turner breached his employment agreement by failing to abide by the covenant not to compete, covenant of non-solicitation, and confidentiality provisions of the agreement by, *inter alia*:

> engaging it in direct competition with WLG before the expiration of the non-competition provision of the agreement;
>
> using WLG's confidential information and trade secrets in the course of his competitive employment; and
>
> soliciting WLG's customers, business contacts and employees before the expiration of the restrictive covenants of the agreement.

112.   WLG has complied with all conditions precedent under the agreement.

113.   As a proximate result of Turner's breach of the agreement, WLG has suffered actual damages in an amount to be proven at trial.

114.   WLG has also suffered and will continue to suffer irreparable injuries and harm unless Turner is enjoined from the wrongful conduct described above.

## Count VIII

### Unfair Competition

### (WLG v. All Defendants)

115.   WLG repeats and incorporates the allegations of the foregoing paragraphs of this Complaint as if set forth herein at length.

116.   The foregoing conduct and threatened conduct of Defendants constitutes unfair competition.

117.   Such unfair competition has proximately caused and will proximately result in damage to WLG.

118.   Unless defendants are restrained and enjoined from such unfair competition, WLG will suffer irreparable injury and harm for which there is no adequate remedy at law.

## DEMAND FOR RELIEF

**WHEREFORE,** WLG respectfully seeks a judgment in its favor and against Defendants, as follows:

(1)   The issuance of a temporary restraining order, a preliminary injunction and a final, permanent injunction as follows from the following:

(a)   to prevent further violations of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) and applicable trade libel and commercial disparagement laws.

(b)     to prevent Reicherter from directly or indirectly soliciting, contacting, retaining, employing, recruiting, or attempting to recruit any current customers, prospective customers, cargo agents and/or employees of WLG for a period of 3 years from the date of the issuance of the injunction order.

(c)     to prevent Zambuto from directly or indirectly soliciting, contacting, retaining, employing, recruiting, or attempting to recruit any customers, prospective customers, cargo agents and/or employees of WLG for a period of 2 years from the date of the issuance of the injunction order;

(d)     to prevent Turner from directly or indirectly soliciting, contacting, retaining, employing, recruiting, or attempting to recruit any customers, prospective customers, cargo agents and/or employees of WLG for a period of 18 months from the date of the issuance of the injunction order;

(e)     to prevent the Individual Defendants from continuing to disclose, transfer and convey any confidential information and/or trade secrets (as defined in the their employment agreements) to any third party in violation of their employment agreement;

(f)     to require the Individual Defendants to return any electronic or hard copy documents, files, records, information or other property that the Individual Defendants obtained from or by virtue of their employment with Plaintiffs; and

(g)     to prevent Turner from working for or otherwise being employed by USA Logistics and/or Stile Associates or in any way engaging in activities that are competitive with the business of Plaintiffs in any restricted location as defined in the

Agreements during the 12-month restrictive period of his employment agreement, which period should be calculated from the date of the issuance of the injunction order.

(2)     For an order compelling defendants to file with this court and serve upon plaintiffs' counsel within thirty days after service upon defendants of this court's injunction issued in this action, a written report sworn to and signed under oath setting forth in detail the manner in which defendants have complied with such injunction.

(3)     An award of compensatory damages, punitive damages, attorneys' fees, expenses and costs of suit against defendants, along with such other relief as may be proper.

### DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury of all issues which may be so tried.

**K&L GATES LLP**
Attorneys for Plaintiffs

By:

Vincent N. Avallone, Esq.
One Newark Center, 10th Fl.
Newark, New Jersey  07102
Telephone: (973) 848-4000
Email: vincent.avallone@klgates.com

599 Lexington Avenue
New York, New York

Dated:  New York, New York
        April 20, 2011

- 30 -

## VERIFICATION

Pursuant to 28 U.S.C. § 1746, I, SEBASTIAN TSCHACKERT, on behalf of the Plaintiffs herein, declare under penalty of perjury under the laws of the United States of America that factual allegations in the foregoing Verified Complaint for Injunctive Relief are true and correct to the best of my knowledge or information and belief. I understand that this verification is made subject to the penalties of perjury under 18 U.S.C. §1621 (relating to unsworn falsifications to authorities).

Dated: April  , 2011

_____
SEBASTIAN TSCHACKERT

**VERIFICATION**

Pursuant to 28 U.S.C. § 1746, I, MICHELE O'BRIEN, on behalf of the Plaintiffs herein, declare under penalty of perjury under the laws of the United States of America that factual allegations in the foregoing Verified Complaint for Injunctive Relief are true and correct to the best of my knowledge or information and belief. I understand that this verification is made subject to the penalties of perjury under 18 U.S.C. §1621 (relating to unsworn falsifications to authorities).

Dated: April   , 2011

_____
MICHELE O'BRIEN

## **VERIFICATION**

Pursuant to 28 U.S.C. § 1746, I, ALLEN QUINN, on behalf of the Plaintiffs herein, declare under penalty of perjury under the laws of the United States of America that factual allegations in the foregoing Verified Complaint for Injunctive Relief are true and correct to the best of my knowledge or information and belief. I understand that this verification is made subject to the penalties of perjury under 18 U.S.C. §1621 (relating to unsworn falsifications to authorities).

Dated: April 19, 2011

ALLEN QUINN

**EXHIBIT A**

AMENDMENT TO EMPLOYMENT AGREEMENT

This Amendment to the May 1, 2009 Employment Agreement (Exhibit A hereto) and May 25, 2010 salary and commission memorandum (Exhibit B hereto), is made and entered into on January 13, 2011, by and between World Commerce Services, LLC d/b/a WLG USA, LLC, an Illinois corporation (the "Company"), WLG, Inc., a Delaware corporation ("WLG") and Scott Turner (the "Executive"), who are also collectively referred to herein as "The Parties." This Agreement is also referred to herein as the "Amendment Agreement."

WHEREAS, the Parties mutually desire to amend and modify the May 1, 2009 Employment Agreement (Exhibit A) and the May 25, 2010 salary and commission memorandum (Exhibit B) to address changed business conditions and to resolve Executive's year-end reconciliation, which is presently due and owing the Company;

NOW THEREFORE, in consideration of the promises and covenants set forth herein, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1. <u>Paragraph 5.1</u>: The Parties agree to modify, replace and supersede Paragraph 5.1 of Exhibit A so that it reads as follows:

In consideration of the services rendered to NYO hereunder by the Executive and the Executive's covenants hereunder, for the year 2011, the Company shall pay to the Executive an annual base salary at the rate of $260,000 (the "Base Salary") for the time period beginning January 1, 2011 through December 31, 2011, less statutory deductions and withholdings, payable in accordance with the Company's normal payroll practices. Annually, the WLG's Board of Directors (the "Board"), will review and may revise the Base Salary for, among other items the Board deems relevant, competitiveness, the business of the NYO in the then business environment (including but not limited to the NYO's financial performance), the stage of development of the NYO and industry appropriateness.

2. <u>Paragraph 6.2(b)(ii)</u>. The parties agree to modify, replace and supersede Paragraph 6.2(b)(ii) of Exhibit A so that it reads as follows:

(ii) continue to pay the Executive the Base Salary (as defined above in this Amendment Agreement), and shall reimburse medical and dental premiums, under the same conditions as exist at the time of termination, for a severance period of one (1) month, provided termination occurs after twelve (12) months from the Effective Date of Exhibit A;

The Parties hereto agree, understand and intend that the intent of this new 6.2(b)(ii) is to limit the Executive's severance period to one (1) month in the event of a termination of the Executive's employment by the Company without "Cause" or the Executive's termination of his employment with the Company for "Good Reason" as these terms are defined in Exhibit A.

3. <u>May 25, 2010 Salary and Commission Memorandum (Exhibit B)</u>. The Parties agree that the base salary and commission schedule set forth in Exhibit B are hereby null and void, that no further commissions will be paid under Exhibit B, and that as consideration for this Amendment Agreement, Executive will not be required to pay the $37,500 amount due and owing the Company based on the 2010 year-end reconciliation, as required by Exhibit B. The Parties

further agree to renegotiate the commission calculation schedule in April 2011 to create the "post-April 2011 commission schedule", and further agree that the post-April 2011 commission schedule will include language entitling the Company to pay commissions retroactively (or "in arrears"). As additional consideration for this Amendment Agreement, the Company has increased Executive's Base Salary from $250,000 to $260,000 as set forth in Paragraph 1 of this Amendment Agreement.

4. Totality of Agreement. The Parties agree and understand that the remaining provisions of Exhibit A not addressed in this Amendment Agreement remain in full force and effect, and binding upon each of them, jointly and individually. The Parties further agree and represent that each Party understands and jointly drafted the terms of this Amendment Agreement, and is fully aware of the rights it/he/they are waiving and the consideration it/he/they are receiving, to which it/he/they would not otherwise be entitled in the absence of this Amendment Agreement. Moreover, the Parties agree that this Amendment Agreement constitutes a valid modification of Exhibits A and B as permitted by Paragraph 14 of Exhibit A.

IN WITNESS HEREOF, the Parties have executed this Amendment Agreement as of the date and year first above written.

EXECUTIVE

_____
Scott Turner

World Commerce Services, LLC
d/b/a WLG USA, LLC

By:_____

Title:_____

Date:_____, 2011


WLG, Inc.

By:_____

Title:_____

Date:_____, 2011

EXHIBIT A FOLLOWS

## EMPLOYMENT AGREEMENT

This Employment Agreement (the "Agreement"), made and entered into as of this 1st day of May, 2009 (the "Effective Date"), by and between World Commerce Services, LLC, an Illinois corporation ("Company"), WLG Inc, a Delaware corporation) ("WLG") and Scott Turner (the "Executive").

### WITNESSETH

WHEREAS, the Company is a wholly owned subsidiary of WLG Inc.; and

WHEREAS, the Company desires to hire the Executive and the Executive desires to become employed by the Company; and

Whereas, the Company has established a second branch office in New York to conduct certain business and referred to as New York Office ("NYO"); and

WHEREAS, the Company and the Executive have determined that it is in their respective best interest to enter into this Agreement on the terms and conditions as set forth herein.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and promises contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1.    Employment.  The Company hereby agrees to employ the Executive, and the Executive hereby agrees to serve the Company, upon the terms and conditions set forth herein.

2.    Term.  The employment of the Executive by the Company pursuant to this Agreement as provided in Section 1 will commence on the Effective Date and continue until December 31, 2014, or until Executive's employment is terminated as provided in Section 6 hereof (the "Term").

3.    Position.  The Executive shall serve as the President ("President") of the NYO (the "Position").

4.    Reporting and Duties.

4.1    President.  With respect to the Executive's duties, the Executive shall, at all times during the Term, report directly to the Chief Executive Officer of WLG for all matters, except Executive shall have a dotted line to report the Chief Executive Officer of WCS for administrative, finance and human resource issues.

4.2    Duties.  In connection with his Position, the Executive shall have such responsibilities, duties and authority as are generally associated with such office and as may from time to time be assigned to the Executive by WLG's Chief Executive Officer, including, but not limited to, responsibility for the operations of the newly formed NYO . For the sake of

clarity, WCS has an existing branch in New York ("WCS Branch") Executive shall have no responsibility for any matters in connection with the WCS Branch.

The Executive shall perform his duties diligently and faithfully and shall devote all his working time and efforts to the business and affairs of the NYO. Notwithstanding anything in this Section 4 to the contrary, the Executive shall not be required to perform any duties or responsibilities that would result in a violation of, or noncompliance with, any law, regulation, regulatory pronouncement or any other regulatory requirement applicable to the NYO and the conduct of the NYO's business or to the Executive in his capacity as President of the NYO.

5.     **Compensation and Related Matters.**

5.1     **Base Salary.** In consideration of the services rendered to NYO hereunder by the Executive and the Executive's covenants hereunder, the Company shall, during the Term, pay to the Executive an annual base salary at a rate of $400,000 for the period beginning with the Effective Date and ending on December 31, 2013 of this Agreement (the "**Base Salary**"), less statutory deductions and withholdings, payable in accordance with the Company's normal payroll practices. At least annually, the WLG's Board of Directors (the "Board") will review the Base Salary for, among other items the Board deems relevant, such as competitiveness, the business of the NYO in the then business environment, the stage of development of the NYO and appropriateness in the industry. The Base Salary shall be payable every two weeks in arrear's in accordance with the Company's normal payroll practices.

5.2     **Annual Bonus.** For each calendar year during the Term, the Executive shall be eligible to participate in the Company's incentive programs and in connection therewith to receive annual bonuses (each a "**Bonus**"). Such Bonus, if any, shall be determined according to annual benchmarks to be set by the Board and agreed by the Executive.

5.3     **Stock Options.**

5.4     For each calendar year during the Term, the Executive shall be eligible to participate in WLG's stock option plan and to receive, subject to the determination of the Board, options to purchase shares of the WLG's common stock (the "**Options**"). Such Options shall be awarded in the sole discretion of the Board and shall have vesting provisions, exercise prices and terms as determined by the Board. The Options shall be issued pursuant to WLG's Stock Incentive Plan and will be evidenced by a Stock Option Grant Agreement. Any such Options will be granted, to the maximum amount of shares currently permitted by law, in the form of incentive stock options and the remainder in non-qualified options.

5.5     **Reserved**

5.6     **Expenses.** The Executive shall be entitled to receive prompt reimbursement for all reasonable and customary expenses incurred by the Executive in performing services hereunder, provided that such expenses are incurred and accounted for in accordance with the policies and procedures established by the Company.

5.7     Benefits.

    (a)     The Executive shall be entitled to participate in the Company's group medical and life insurance plans during the Term.

    (b)     The Executive shall be entitled to a car allowance of $1,500 per month of the Term. Company and Executive shall review the car allowance as of December 31, 2009, to determine if such amount should be adjusted to give effect to the then current costs of operating an automobile.

    (c)     The Executive shall be entitled to four (4) weeks paid vacation per calendar year.

6.     Termination.  The Executive's employment hereunder may be terminated under the following circumstances:

6.1     Death or Disability.  In the event of the Executive's death or Disability (as defined below) during the Term of this Agreement, the Executive's employment hereunder shall immediately and automatically terminate, and the Company shall have no further obligation or duty to the Executive or his estate or beneficiaries other than for the Base Salary earned under this Agreement to the date of termination, reimbursement of corporate expenses to which Executive would otherwise be entitled, and any payments or benefits due under Company policies or benefit plans which shall be paid within a reasonable time following death or Disability.  For purposes of this Agreement, "Disability" shall mean the physical or mental infirmity of which such infirmity causes him to be substantially unable to perform his duties hereunder for any period of ninety (90) consecutive days; provided, however, that notwithstanding anything to the contrary herein and despite any termination of Executive's employment under this Section 6, Executive shall be entitled in the event of a termination on account of Disability: (i) to retain any disability benefits, which amounts shall not be offset by any disability benefits received by Executive from any other source, (ii) to receive his Base Salary until such time as he has commenced receiving disability payments under the Company's policies, (iii) to receive a prorated portion of the Bonus to which Executive would otherwise have been entitled for the calendar year through the date of termination (as determined by the Board), and (iv) accrued but unused vacation.  Executive shall have a period of one (1) year following the termination of his employment pursuant to this Section 6.1 to exercise any vested Options, unless otherwise provided under the particular plan pursuant to which such vested Options were granted.

6.2     Cause, Without Cause Termination by the Executive.  Notwithstanding the provisions of Section 2 of this Agreement, the Executive's employment hereunder may terminate under the following circumstances:

    (a)     Termination by the Company for Cause.  The Board may terminate this Agreement for Cause (as defined below) at any time, upon written notice to the Executive setting forth in reasonable detail the nature of such Cause.  For purposes of this Agreement, "Cause" is defined as (i) the Executive's material breach of this Agreement; (ii) the Executive's commission of any

-3-

felony or any crime involving moral turpitude; or (iii) gross neglect or willful misconduct by the Executive in connection with the performance of his duties hereunder, or his refusal to perform such duties reasonably requested in the ordinary course; provided, however, that the Company shall give Executive ten (10) days' written notice and opportunity to cure prior to any termination for Cause based on the grounds specified in (i) and (iii) above, provided such cure period would not have a material adverse effect on the Company. Upon the termination for Cause of Executive's employment, the Company shall not have any further obligation and/or liability to the Executive other than for Base Salary earned under this Agreement prior to the date of termination, reimbursement for corporate expenses for which Executive would otherwise be entitled, and any accrued but unused vacation. Executive's vested but unexercised Options shall expire immediately upon his termination for Cause.

(b)     Termination by the Company Without Cause.  The Executive's employment hereunder may be terminated without Cause by the Company upon ninety days (90) written notice to the Executive, provided, however, that if the Company terminates the Executive's employment without Cause, or the Executive terminates his employment for Good Reason (as defined below), the Company shall (i) continue to pay the Executive the Base Salary and shall reimburse medical and dental premiums, under the same conditions as exist at the time of termination, for a severance period of 9 months, provided termination occurs after six months and before the completion of 12 months from the Effective Date; (ii) continue to pay the Executive the Base Salary and shall reimburse medical and dental premiums, under the same conditions as exist at the time of termination, for a severance period of 12 months, provided termination occurs after 12 months from the Effective Date; (iii) pay to the Executive a prorated portion of the Bonus to which Executive would otherwise have been entitled based on performance through the calendar quarter in which the termination has occurred, (iii) reimburse Executive for corporate expenses for which Executive would otherwise be entitled, (iv) cause any unvested Options granted to the Executive to immediately vest, and (v) pay Executive for any accrued but unused vacation.  The Company's obligations under this Section 6.2(b) are not subject to any right of setoff and impose no duty to mitigate on Executive.  As a condition of receiving severance benefits pursuant to this Agreement, the Executive shall execute and deliver to the Company prior to his receipt of such benefits a general release in substantially the context set forth in Annex A hereto.  The obligations of the Company under this Section 6.2(b) are subject to Executive's compliance with Sections 3, 4, 8, 9 and 10 and hereof

Termination by the Executive.  The Executive may terminate his employment hereunder for any reason upon ninety (90) days express prior written notice to the Company. (the "Notice Period").  In the event Executive provides notice of termination pursuant to this Section 7.2(c), the Company may elect to terminate Executive at any time during the

-4-

Notice Period without such termination being deemed a termination by
the Company under this Agreement; provided that the Company shall
nevertheless pay the Executive for any remaining portion of the Notice
Period an amount equal to the Base Salary and benefits at the rate of
compensation the Executive was receiving immediately before the Notice
Period, unless such termination is for Cause, in which event Section 7.2(a)
shall apply. The payments in the preceding sentence shall be in addition to
any other payments Executive is entitled to receive under this Agreement
as a result of the termination by Executive. The Executive may also
terminate his employment hereunder within sixty (60) days after the
occurrence of any of the following events (i) a material breach of a
material provision of this Agreement by the Company; (ii) a material
change in the Executive's duties or responsibilities inconsistent with his
position as President of the NYO, including any reduction in Base Salary;
or (iii) a change in the Executive's reporting relationship so that he no
longer reports directly to the Chief Executive Officer of WLG (collectively,
"Good Reason"). The Executive shall give the Company thirty (30) days'
express prior written notice and opportunity to cure prior to any termination
for Good Reason based on the grounds specified in (i) through (iii) above.

7.    Confidentiality; Disclosure of Information.

7.1    The Executive recognizes and acknowledges that the Executive has had and will
have access to Confidential Information (as defined below) relating to the business or interests of
the Company, WLG and its subsidiaries (collectively "WLG Group") or of persons with whom
the WLG Group may have business relationships. Except as permitted herein, the Executive will
not during the Term, or at any time thereafter, use, disclose or permit to be known by any other
person or entity, any Confidential Information of the WLG Group (except as required by
applicable law or as Executive deems necessary in connection with the performance of the
Executive's duties and responsibilities hereunder). The term "Confidential Information"
means information relating to the WLG Group's business affairs, customers, proprietary
technology, trade secrets, patented processes, research and development data, know-how, market
studies and forecasts, competitive analyses, pricing policies, employee lists, employment
agreements (other than this Agreement), personnel policies, the substance of agreements with
customers, suppliers and others, marketing arrangements, customer lists, commercial
arrangements, or any other information relating to the WLG Group's business that is not
generally known to the public or to actual or potential competitors of the WLG Group (other than
through a breach of this Agreement). This obligation shall continue until such Confidential
Information becomes publicly available, other than pursuant to a breach of this Section 8 by the
Executive, regardless of whether the Executive continues to be employed by the Company.

7.2    It is further agreed and understood by and between the parties to this Agreement
that all "WLG Group Materials," which include, but are not limited to, computers, computer
software, computer disks, tapes, printouts, source, HTML and other code, flowcharts,
schematics, designs, graphics, drawings, photographs, charts, graphs, notebooks, customer lists,

-5-

sound recordings, other tangible or intangible manifestation of content, and all other documents whether printed, typewritten, handwritten, electronic, or stored on computer disks, tapes, hard drives, or any other tangible medium, as well as samples, prototypes, models, products and the like, shall be the exclusive property of the WLG Group and, upon termination of Executive's employment with the Company, and/or upon the request of the WLG Group, all WLG Group Materials, including copies thereof, as well as all other WLG Group property then in the Executive's possession or control, shall be returned to and left with the WLG Group.

8.      **Inventions Discovered by Executive.** The Executive shall promptly disclose to the WLG Group any invention, improvement, discovery, process, formula, or method or other intellectual property, whether or not patentable or copyrightable (collectively, "**Inventions**"), conceived or first reduced to practice by the Executive, either alone or jointly with others, while performing services hereunder (or, if based on any Confidential Information, within fifteen months after the Term), (a) which pertain to any line of business of the WLG Group, whether then conducted or than being actively pursued by the WLG Group, (b) which is developed using time, material or facilities of the WLG Group, whether or not during working hours or on or the WLG Group premises, or (c) which directly relates to any of the Executive's services during the Term, whether or not during normal working hours. The Executive hereby assigns to the WLG Group all of the Executive's right, title and interest in and to any such Inventions. During the Term and for eighteen (18) months thereafter, the Executive shall execute any documents necessary to perfect the assignment of such Inventions to the WLG Group and to enable the WLG Group to apply for, obtain and enforce patents, trademarks and copyrights in any and all countries on such Inventions, including, without limitation, the execution of any instruments and the giving of evidence and testimony, without further compensation beyond the Executive's agreed compensation during the course of the Executive's employment.

9.      **Non-Competition and Non-Solicitation.**

9.1     The Executive acknowledges that the WLG Group has invested substantial time, money and resources in the development and retention of its Inventions, Confidential Information (including trade secrets), customers, accounts and business partners, and further acknowledges that during the course of the Executive's employment with the Company the Executive will have access to the WLG Group's Inventions and Confidential Information (including trade secrets), and will be introduced to existing and prospective customers, accounts and business partners of the Company. The Executive acknowledges and agrees that any and all "goodwill" associated with any existing or prospective customer, account or business partner belongs exclusively to the WLG Group, including, but not limited to, any goodwill created as a result of direct or indirect contacts or relationships between the Executive and any existing or prospective customers, accounts or business partners. Additionally, the parties acknowledge and agree that Executive possesses skills that are special, unique or extraordinary and that the value of the WLG Group depends upon his use of such skills on their behalf.

9.2     In recognition of the foregoing, the Executive covenants and agrees that:

-6-

(a)    During the Term, and for a period of twelve (2) months thereafter, the Executive may not, without the prior written consent of the Board (whether as an employee, agent, owner, partner, consultant, independent contractor, representative, stockholder or in any other capacity whatsoever) participate in any business that offers products or services competitive in any way to those offered by the WLG Group or that were under active development by the WLG Group during the Term, provided that nothing herein shall prohibit the Executive from owning securities of corporations which are listed co a national securities exchange or traded in the national over-the-counter market in an amount which shall not exceed 5% of the outstanding shares of an such corporation.

(b)    During the Term, and for a period of eighteen (18) months thereafter, the Executive may not entice, solicit or encourage any WLG Group employees to leave the employ of the WLG Group or any independent contractor to sever its engagement with the WLG Group, absent the express, prior written consent to do so from the Board.

(c)    During the Term, and for a period of eighteen (18) months thereafter, the Executive may not, directly or indirectly, entice, solicit or encourage any current or prior customer or prospective customer of the WLG Group to cease doing business with the WLG Group, reduce its relationship with the WLG Group, refrain from establishing or expanding a relationship with the WLG Group or do any business with any other entity

(d)    The foregoing notwithstanding, the provisions of Section 10.2(a) shall apply if the Company terminates the Executive's employment hereunder pursuant to Section 7.2(b) or the Executive terminates his employment pursuant to Section 7.2(c) for only that period of time that the Company is making payments to the Executive pursuant to Section 7.2(b) or 7.2(c) as applicable.

10.    **Provisions Necessary and Reasonable.**  (a)  The Executive agrees that (i) the provisions of Sections 8, 9, and 10 of this Agreement are necessary and reasonable to protect the WLG Group's Confidential Information, Inventions, and goodwill; (ii) the specific temporal, geographic and substantive provisions set forth in Section 10 of this Agreement are reasonable and necessary to protect the WLG Group's business interests; and (iii) in the event of any breach of any of the covenants set forth herein, the WLG Group would suffer substantial irreparable harm and would not have an adequate remedy at law for such breach. In recognition of the foregoing, the Executive agrees that in the event of a breach or threatened breach of any of these covenants, in addition to such other remedies as the WLG Group may have at law, without posting any bond or security, the WLG Group shall be entitled to seek and obtain equitable relief, in the form of specific performance, and/or temporary, preliminary or permanent injunctive relief, or any other equitable remedy which then may be available.

The seeking of such injunction or order shall not affect the WLG Group's right to seek and obtain damages or other equitable relief on account of any such actual or threatened breach.

- 7 -

(a)  If any of the covenants contained in Sections 8, 9, and 10 hereof, or any part thereof, are hereafter construed to be invalid or unenforceable, the same shall not affect the remainder of the covenant or covenants, which shall be given full effect without regard to the invalid portions.

(b)  If any of the covenants contained in Sections 8, 9, and 10 hereof, or any part thereof, are held to be unenforceable by a court of competent jurisdiction because of the temporal or geographic scope of such provision or the area covered thereby, the parties agree that the court making such determination shall have the power to reduce the duration and/or geographic area of such provision and, in its reduced form, such provision shall be enforceable.

11.  **Representations Regarding Prior Work and Legal Obligations.**  (a)  The Executive represents to the Company that the Executive has no direct and/or indirect agreement, contract, undertaking or other legal obligation with any prior employer, or any other person or entity, which restricts the Executive's ability to accept employment with and/or to perform any function for the Company, whether set forth herein or not.

The Executive acknowledges that the Company are basing important business decisions on these representations, and affirms that all of the statements included herein are true.

12.  **Successors; Binding Agreement.**  This Agreement and all rights of the Executive hereunder shall inure to the benefit of and be enforceable by the Executive's personal or legal representatives, executors, administrators, successors, heirs, distributees, devisees and legatees. If the Executive should die, all amounts due following the Executive's death, unless otherwise provided herein, shall be paid in accordance with the terms of this Agreement to the Executive's devisee, legatee, or other designee or, if there is no such designee, to the Executive's estate.

13.  **Notice.**  For the purposes of this Agreement, notices, demands and all other communications provided for in this Agreement shall be in writing and shall be deemed to have been duly given when delivered or (unless otherwise specified) mailed by United States certified or registered mail, return receipt requested, postage prepaid, addressed as follows:

If to the Executive:

Scott Turner
One Cross Island Plaza, Suite LL6
Rosedale, New York 11422
If to the Company:

World Commerce Services LLC
920 East Algonquin Road, Suite 120
Schaumburg, IL 60173 USA
Attn: Corporate Secretary

- 8 -

If to WLG:

WLG Inc.
Unit 1301, 13/F, Ever Gain Plaza, Tower One
88 Container Port Road
Kwai Chung, N.T.
Attn: Corporate Secretary

or to such other address as any party may have furnished to the other in writing in accordance
herewith, except that notices of change of address shall be effective only upon receipt.

14.  **Miscellaneous.** No provision of this Agreement may be amended, modified,
waived or discharged unless such amendment, waiver, modification or discharge is agreed to in
writing signed by the Executive and such officer of the Company or WLG as may be specifically
designated by the Board. No waiver by either party hereto at any time of any breach by the other
party hereto of, or compliance with, any condition or provision of this Agreement to be
performed by such other party shall be deemed a waiver of similar or dissimilar provisions or
conditions at the same or at any prior or subsequent time. No agreements or representations, oral
or otherwise, express or implied, with respect to the subject matter hereof have been made by
either party which are not set forth expressly in this Agreement. This Agreement shall be
binding on all successors to the Company.

15.  **Severability.** The invalidity or unenforceability of any provision or provisions of
this Agreement shall not affect the validity or enforceability of any other provision of this
Agreement, which shall remain in full force and effect.

16.  **Governing Law.** This Agreement shall be governed by and construed in
accordance with the internal laws of the State of New York without regard to the conflicts of
laws principles thereof. The parties hereto hereby irrevocably agree that any suit or proceeding
arising directly and/or indirectly pursuant to or under this Agreement, shall be brought solely in a
federal or state court located in the City, County and State of New York. By its execution hereof,
the parties hereby covenant and irrevocably submit to the *in personam* jurisdiction of the federal
and state courts located in the City, County and State of New York and agree that any process in
any such action may be served upon any of them personally, or by certified mail or registered
mail upon them or their agent, return receipt requested, with the same full force and effect as if
personally served upon them in New York City. The parties hereto expressly and irrevocably
waive any claim that any such jurisdiction is not a convenient forum for any such suit or
proceeding and any defense or lack of *in personam* jurisdiction with respect thereto. In the event
of any such action or proceeding, the party prevailing therein shall be entitled to payment from
the other party hereto of its reasonable counsel fees and disbursements.

17.  **Counterparts.** This Agreement may be executed in two counterparts, each of
which shall be deemed to be an original but both of which together will constitute one and the
same instrument.

18.  **Survivorship.** The respective rights and obligations of the parties to this
Agreement shall survive the termination of this Agreement or the Executive's employment

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date and year first above written.

EXECUTIVE

_____
Scott Turner

Dated: __5/18/__, 2009

World Commerce Services LLC

By:_____

Title:_____

Dated: _____, 2009

WCG, Inc

By:_____

Title:_____

Dated: _____, 2009

SIGNATURE PAGE TO EMPLOYMENT AGREEMENT
OF SCOTT TURNER

- 11 -

EXHIBIT B FOLLOWS



WLG (USA), LLC and
World Commerce Services, LLC
920 East Algonquin Road, Suite 120
Schaumburg, IL 60173 USA

T  224.653.2800
F  224.653.2800
www.wlglogistics.com

To:      Scott Turner

From:    Michele O'Brien

Re:      Base Salary/Bonus Plan

As previously discussed, effective January 1, 2010 your base salary has been changed to $250,000 per year.
You are now incented to earn an additional $100,000 per annum based on the performance of the JFK group.
This bonus will be based on actual to budgeted gross margin for the group.  You will earn a percentage of the
eligible bonus according to the following scale:

### COMMISSION CALCULATION SCHEDULEE

ELIGIBLE BONUs = $100,000 PER YEAR

| ACTUAL TO BUDGETED MARGIN (%) | COMMISSION EARNED | AMOUNT |
|---|---|---|
| 0-69% | 0 | - |
| 70-74% | 25% of Eligible Bonus | $25,000 |
| 75-79% | 37.5% of Eligible Bonus | $37,500 |
| 80-84% | 50% of Eligible Bonus | $50,000 |
| 85-89% | 62.5% of Eligible Bonus | $62,500 |
| 90-94% | 75% of Eligible Bonus | $75,000 |
| 95-99% | 87.5% of Eligible Bonus | $87,500 |
| 100% or greater | 100% of Eligible Bonus | $100,000 |

- Progress toward your target will be reviewed at the end of each quarter.

- When your percentage level has been determined at each quarter-end, your draw will be adjusted to
  meet that level of eligibility less any amounts owed to the Company.

- At year end a final reconciliation will determine amounts due or owed and will be paid or collected at
  that time.

We look forward to a year of opportunity and growth for the company and are confident JFK will contribute
significantly to that growth through your efforts.

Please acknowledge your understanding and acceptance of this bonus plan by signing and dating below.

Sincerely,

Michele O'Brien, PHR
Human Resources Manager

Acknowledged & Accepted: _____            5-25-10
                          Scott Turner                       Date

Approved: _____            5-25-10
          Ed Pawelko                          Date
          Chief Executive Officer

**EXHIBIT B**

## EMPLOYMENT AGREEMENT

This Agreement is entered into this __1__ day of __May__, 20 _09_, between WLG (USA), LLC, an Illinois limited liability company (the "Company"), and ( Joanne Reuneiter , ("Employee"), residing at the address set forth beneath his or her signature to this Agreement.

WHEREAS, Company is currently engaged in the business of an international freight forwarder U.S. customs broker and through its own resources, the Company has developed at great length and expense, extensive customer lists and a specific method by which it provides international freight forwarding and customs brokerage services to its customers on a worldwide basis, as a result of which, Company has developed substantial good will and earning capacity; and

WHEREAS, Company desires to employ or to continue to employ the Employee; and

WHEREAS, Employee desires to accept or continue the employment with Company currently held by or being offered to Employee upon the additional terms and conditions of employment hereinafter contained;

NOW, THEREFORE, in consideration of the mutual covenants set forth below, and of the compensation to be paid to Employee in accordance with Company policy, Employee and Company agree as follows:

1.       Employee agrees to devote Employee's entire working time to the promotion of Company's business and welfare and to use Employee's best efforts to promote the development and sale of Company's services. Employee shall perform such duties and responsibilities incidental to his or her employment as may from time to time be requested by management of Company, and shall faithfully observe Company's policies and procedures contained in Company's employee manual, or otherwise made known to Employee.

2.       All tangible materials, whether originals or duplicates, including, but not limited to, models, engineering or other diagrams or specifications, product formulae, computer programs, books, records, manuals, sales literature, training materials, client record cards, client files, correspondence, documents, contracts, orders, messages, memoranda, notes, agreements, invoices and receipts in the possession or control of Employee which in any way relate or pertain to Company's business, whether furnished to Employee by Company or prepared, compiled or acquired by Employee while employed by Company, shall be the sole property of Company. Employee agrees that he or she will at any time upon request of Company, and in any event promptly upon termination of his or her employment, deliver all such materials to Company.

1

3.    In the course of Employee's employment and because of the nature of Employee's responsibilities, Employee will acquire valuable confidential information and trade secrets with respect to the business operations of Company, including, but not limited to, existing and contemplated services, products, business methods, practices and plans, pricing, costs, margins, selling techniques, methods of obtaining customers, credit and financial data of suppliers, and the identities, business needs and preferences of Company's present and prospective customers, suppliers and overseas agents. · It is understood by and between the parties to this Agreement that such confidential information and trade secrets have been developed by Company over a number of years at great expense, are not readily available to or ascertainable by the freight forwarding industry generally, and have been kept secret and divulged to employees only on a need-to-know basis.

4.    Employee further understands and concedes that Employer has a legitimate and unique business interest in its customers and overseas agents given its near-permanent relationship with said customers.  Employee also understands and concedes that (s)he had no relationship with Company's customers and overseas agents prior to accepting employment with Company and that all contact thereafter would not have occurred but for said employment.

5.    In light of the foregoing and in consideration of the remuneration to be paid to Employee, Employee agrees that it is reasonable and necessary for the protection of the goodwill and business of Company that Employee make the covenants contained in paragraphs 6 and 7 regarding the conduct of Employee during and subsequent to his or her employment with Company, and further agrees that Company will suffer irreparable injury if Employee·engages in conduct prohibited thereby.  Employee understands and agrees that because Company's customers come from locations throughout the United States and because its overseas agents come from locations throughout the world,  the lack of a more circumscribed geographical restriction in paragraph 7 is both reasonable and necessary.  Employee represents and agrees that his or her experience and abilities are such that observance of the aforementioned covenants will not cause Employee any undue hardship nor will it unreasonably interfere with Employee's ability to earn a livelihood.

6.    Employee agrees that while in the employ of Company or at any time thereafter he or she will not, without the express written consent of Company, directly or indirectly disclose any of Company's trade secrets or other confidential information, to the extent such trade secrets or confidential information were communicated to or otherwise learned or acquired by Employee in the course of his or her employment with Company, except that Employee may disclose such matters to the extent that disclosure is required (a) in the course of his or her employment with Company or (b) by a court or other governmental agency of competent jurisdiction.

7.    Employee agrees that during his or her employment at Company and for a period of three (3) years thereafter, he or she will not, directly or indirectly: (a) solicit any of Company's U.S. customers or overseas agents for freight forwarding business;  (b) disclose the names of any such customers or overseas agents to any other person or entity; or (c) hire or solicit or attempt to persuade any of the employees of Company to leave the employ of Company or otherwise interfere with the performance of their duties for Company.

WLGEmploymentAgreementOct2007

8.    The covenants contained in paragraphs 6 and 7 shall each be construed as separate agreements independent of any other provision of this Agreement, and the existence of any claim or cause of action of Employee against Company, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement by Company of such covenants.

9.    In the event of a breach or a threatened or intended breach of paragraphs 6 and 7 of this Agreement by Employee, Company shall be entitled, in addition to remedies otherwise available to Company at law or in equity, to injunctions, both preliminary and final, enjoining and restraining such breach or threatened or intended breach, and Employee hereby consents to the issuance thereof forthwith in any court of competent jurisdiction. In the event Company shall successfully enforce any part of this Agreement through legal proceeding, Employee agrees to pay to Company all costs and attorneys' fees reasonably incurred by Company in connection therewith.

10.    This Agreement represents the complete agreement between Company and Employee concerning the subject matter hereof and supersedes all prior agreements or understandings, whether written or oral. No attempted modification, termination or waiver of any of the provisions hereof shall be binding on either party unless in writing and signed by both Employee and Company, and no waiver of any breach or modification of any provision hereof shall be construed to be a waiver of any succeeding breach or as a waiver or modification of such provision. Nothing in this Agreement shall be construed to require Employee to continue his or her employment for any particular length of time or require Company to continue such employment for any particular length of time.

11.    Except for this Agreement and the covenants herein specifically provided to be performed or to remain in force following termination of Employee's employment, neither party hereto shall, after termination or employment, be under any further obligation to the other with respect to this Agreement.

12.    Each of the agreement and covenants contained in this Agreement shall be enforceable independently of every other agreement and covenant in the Agreement, and the invalidity or unenforceability of any agreement or covenant contained herein shall not invalidate or render unenforceable any other agreement or covenant contained herein. If any portion of the restrictions on Employee's activities set forth in paragraphs 6 and 7 of this Agreement is deemed invalid, the parties hereby stipulate that a court of competent jurisdiction may modify said restrictions to the extent necessary to make them valid.

13.    Any notice required or permitted to be given hereunder shall be in writing and shall be effective three (3) business days after it is sent by registered or certified mail, if to the Company to WLG (USA), LLC, 920 East Algonquin Road, Suite 120, Schaumburg, IL 60173, Attention: President, or if to Employee, to the address set forth beneath his or her signature to this Agreement, or to such other address as either party may from time to time designate by notice to the other party.

3

West Employment Agreement Jan 2004

14.    This Agreement shall be binding upon Employee and his or her heirs and the Company and its successors and assigns and shall inure to the benefit of the Company and its successors and assigns.

15.    It is the intention of the parties hereto that all questions with respect to the construction, formation and performance of this Agreement and the rights and liabilities of the parties hereto and shall be determined in accordance with the laws of the State of Illinois. Employee hereby submits to the jurisdiction of the courts of Illinois with respect to any matter or thing arising out of this Agreement or pursuant hereto.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement in Schaumburg,

Illinois, as of the date first above written.

WLG (USA), LLC

BY: _Michele O'Brien_

_Joanne Reicherter_
Employee Signature

NAME OF EMPLOYEE:   Joanne Reicherter

ADDRESS:   627 S. Bayview Ave

CITY, STATE, ZIP:   Freeport NY 11520

4

**EXHIBIT C**

EMPLOYMENT AGREEMENT

This Agreement is entered into this __12__ day of __Oct__ , 200_9_ between World Commerce Services, LLC (the "Company" or "Employer") on behalf of itself and its affiliated companies WLG (USA) LLC and Mares Shreve and Associates, Inc. (hereinafter referred to as "affiliates"), and __JoAnn Zombito__ ("Employee"), residing at the address set forth beneath his or her signature to this Agreement.

WHEREAS, Company and its affiliates are currently engaged in the business of international freight forwarding, United States customs brokerage, logistics and non-vessel operating common carrier services, and through their own resources, the Company and its affiliates have developed at great length and expense and provided to Employee and others on a need-to-know basis to perform work for the Company and its affiliates, extensive customer and overseas agent lists, a specific method by which they provides international freight forwarding, United States customs brokerage, logistics and non-vessel operating common carrier services to their customers on a worldwide basis, and other confidential information, as a result of which, Company and its affiliates have developed substantial good will and earning capacity; and

WHEREAS, the Company and its affiliates have longstanding, near-permanent relationships with their customers and overseas agents and have provided and will provide Employee the opportunity to develop and nurture those relationships on behalf of the Company and its affiliates; and

WHEREAS, Company desires to employ or to continue to employ the Employee; and

WHEREAS, Employee desires to accept or continue the employment with Company currently held by or being offered to Employee upon the additional terms and conditions of employment hereinafter contained;

C-608257 v9

NOW, THEREFORE, in consideration of the mutual covenants set forth below, and of the compensation to be paid to Employee in accordance with Company policy, Employee and Company agree as follows:

1.      Employee agrees to devote Employee's entire working time to the promotion of Company's and its affiliates' business and welfare and to use Employee's best efforts to promote the development and sale of Company's and its affiliates' services. Employee shall perform such duties and responsibilities incidental to his or her employment as may from time to time be requested by management of Company, and shall faithfully observe Company's policies and procedures contained in Company's employee manual, or otherwise made known to Employee.

2.      All tangible materials, whether originals or duplicates, including, but not limited to, models, engineering or other diagrams or specifications, pricing, margins, shipping histories, customer and agent lists and contact information, product formulae, computer programs, books, records, manuals, sales literature, training materials, client record cards, client files, correspondence, documents, contracts, orders, messages, memoranda, notes, agreements, invoices and receipts and other information encompassed in Paragraph 3 below, in the possession or control of Employee which in any way relate or pertain to Company's and/or its affiliates' business, whether furnished to Employee by Company or affiliates or prepared, compiled or acquired by Employee while employed by Company, shall be the sole property of Company and/or its affiliates. Employee agrees that he or she will at any time upon request of Company, and in any event promptly upon termination of his or her employment, deliver all such materials to Company.

3.      In the course of Employee's employment and because of the nature of Employee's responsibilities, Employee will acquire valuable confidential information and trade secrets with respect to the business operations of Company and its affiliates, including, but not limited to, existing and contemplated services, products, business methods, practices and plans, pricing, costs, and margins; selling techniques and other methods of obtaining customers; credit and financial data of suppliers, and lists of and the identities of, business needs of and preferences of Company's and its affiliates' present and prospective customers, suppliers and overseas agents, sales presentation methods; marketing strategies; financial information including its capital and ownership structure; creditors, debtors and financial data; personnel and compensation information or reports; information relating to proposed and/or ongoing acquisitions or takeovers; information relating to employee or agent stock ownership or entitlement; other customer information including customer and prospective customer purchasing histories; supplier and/or agent identities, contact information, prices, and specialties; client, supplier and/or agent agreements; information regarding sales revenues and profits or other sensitive information pertaining to Company and its affiliates' business; business plans and proposals; and any other material or information of whatever nature which provides Company and/or its affiliates an opportunity to gain an advantage over its competitors. It is understood by and between the parties to this Agreement that such confidential information and trade secrets have been developed by Company and its affiliates over a number of years at great expense, are not readily available to or ascertainable by the freight forwarding industry generally, and have been kept secret and divulged to employees only on a need-to-know basis.

2

4.     Employee further understands and concedes that Employer and its affiliates have legitimate and unique business interests in their customers and overseas agents given their near-permanent relationship with said customers and overseas agents. Employee also understands and concedes that (s)he had no relationship with Company's and its affiliates' customers and overseas agents prior to accepting employment with Company and that all contact thereafter would not have occurred but for said employment.

5.     As consideration for this Agreement, Employer shall employ and/or continue to employ Employee for an indefinite period of time on an at-will basis as set forth herein, and shall provide Employee with access to its and its affiliates' Confidential Information (as defined herein) and customers as necessary for Employee to perform his/her duties and responsibilities. Employee further agrees that it is reasonable and necessary for the protection of the goodwill and business of Company and its affiliates that Employee make the covenants contained in paragraphs 6 and 7 regarding the conduct of Employee during and subsequent to his or her employment with Company, and further agrees that Company and its affiliates will suffer irreparable injury if Employee engages in conduct prohibited thereby. Employee understands and agrees that because Company's and its affiliates' customers come from locations throughout the United States and because its overseas agents come from locations throughout the world, the lack of a more circumscribed geographical restriction in paragraph 7 is both reasonable and necessary. Employee represents and agrees that his or her experience and abilities are such that observance of the aforementioned covenants will not cause Employee any undue hardship nor will it unreasonably interfere with Employee's ability to earn a livelihood.

6.     Employee agrees that while in the employ of Company or at any time thereafter he or she will not, without the express written consent of Company, directly or indirectly use or disclose any of Company's and its affiliates' trade secrets or other confidential information, to the extent such trade secrets or confidential information were communicated to or otherwise learned or acquired by Employee in the course of his or her employment with Company, except that Employee may disclose such matters to the extent that disclosure is required (a) to further the business of Company or its affiliates in the course of his or her employment with Company or (b) by a court or other governmental agency of competent jurisdiction. The parties hereto understand and agree that this applies to electronically stored as well as written information.

7.     Employee agrees that during his or her employment at Company and for a period of two (2) years thereafter, he or she will not, directly or indirectly: (a) solicit or accept business from any of Company's or its affiliates' U.S. customers or overseas agents with whom Employee conducted business on behalf of the Company or its affiliates or about which Employee acquired confidential information, for freight forwarding business and/or United States customs brokerage, logistics, and/or non-vessel operating common carrier services; (b) solicit or accept business from any of the Company's or its affiliates' prospective customers but only if such prospective customers received an offer or proposal from the Company and/or its affiliates that Employee worked on, provided assistance to or had access to confidential information regarding, during the last twelve (12) months of his/her employment; (c) use or disclose the names of any of the Company's or its affiliates' customers or overseas agents to any other person or entity; ur (d) hire or solicit or attempt to persuade any of the employees of Company ur its affiliates to leave the employ of Company or its affiliates or otherwise interfere with the performance of their duties for Company or its affiliates; (e) solicit or attempt to solicit any customer, supplier,

3

vendor, or contractor of Company and/or its affiliates, to terminate or disturb their relationships or business with the Company and/or its affiliates.

8. Each of the covenants contained in paragraphs 6 and 7(a) through 7(e) shall be construed as separate agreements independent of any other provisions of this Agreement, and the existence of any claim or cause of action of Employee against Company or its affiliates, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement by Company and/or its affiliates of such covenants.

9. In the event of a breach or a threatened or intended breach of paragraphs 6 and 7 of this Agreement (including any subparts thereof) by Employee, Company and/or its affiliates shall be entitled, in addition to remedies otherwise available to Company and/or its affiliates at law or in equity, to injunctions, both preliminary and final, enjoining and restraining such breach or threatened or intended breach, and Employee hereby consents to the issuance thereof forthwith in any court of competent jurisdiction. Furthermore, no bond need be posted in conjunction with the application for, or issuance of, an injunction (which requirement is hereby specifically and expressly waived by Employee). In the event Company and/or its affiliates shall successfully enforce any part of this Agreement through legal proceeding, Employee agrees to pay to Company and/or its affiliates all costs and attorneys' fees reasonably incurred by Company and/or its affiliates in connection therewith.

10. This Agreement represents the complete agreement between Company and Employee concerning the subject matter hereof and supersedes all prior agreements or understandings, whether written or oral. No attempted modification, termination or waiver of any of the provisions hereof shall be binding on either party unless in writing and signed by both Employee and Company, and no waiver of any breach or modification of any provision hereof shall be construed to be a waiver of any succeeding breach or as a waiver or modification of such provision. Nothing in this Agreement shall be construed to require Employee to continue his or her employment for any particular length of time or require Company to continue such employment or such compensation for any particular length of time.

11. Except for this Agreement and the covenants herein specifically provided to be performed or to remain in force following termination of Employee's employment, neither party hereto shall, after termination or employment, be under any further obligation to the other with respect to this Agreement.

12. Each of the agreement and covenants contained in this Agreement shall be enforceable independently of every other agreement and covenant in the Agreement, and the invalidity or unenforceability of any agreement or covenant contained herein shall not invalidate or render unenforceable any other agreement or covenant contained herein. If any portion of the restrictions on Employee's activities set forth in paragraphs 6 and 7(a) through 7(e) of this Agreement is deemed invalid, the parties hereby stipulate that a court of competent jurisdiction may modify said restrictions to the extent necessary to make them valid.

13. Any notice required or permitted to be given hereunder shall be in writing and shall be effective three (3) business days after it is sent by registered or certified mail, if to the Company to 920 East Algonquin Road, Suite 120, Schaumburg, IL 60173, Attention: President,

4

or if to Employee, to the address set forth beneath his or her signature to this Agreement, or to such other address as either party may from time to time designate by notice to the other party.

14.    This Agreement shall be binding upon Employee and his or her heirs and the Company and its successors and assigns and shall inure to the benefit of the Company, its affiliates, and its successors and assigns.

15.    It is the intention of the parties hereto that all questions with respect to the construction, formation and performance of this Agreement and the rights and liabilities of the parties hereto and shall be determined in accordance with the laws of the State of Illinois. Employee hereby submits to the jurisdiction of the courts of Illinois with respect to any matter or thing arising out of this Agreement or pursuant hereto.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement in

Schaumburg, Illinois, as of the date first above written.

WORLD COMMERCE SERVICES, LLC

BY: _Michele O'Brien_

_____
Employee Signature

NAME OF EMPLOYEE:  _Adim Zambuto_

ADDRESS:  _627 S Bayview Ave_

CITY, STATE, ZIP:  _Freeport NY 11520_

5

**EXHIBIT D**

**From:** Scott Turner (M)

**Date:** 3/4/11 2:05 pm

I got office x u will get same pay or better deal. All ready on monday. Think about it. Milton is backing

**EXHIBIT E**

**From:** Scott [mailto:Scott@stileintl.com]
**Sent:** Friday, April 01, 2011 12:26 PM
**To:** ▌
**Subject:** RE: Chennai Rates

Hi

Thank You !!

I will be providing you Shanghai rates next week..

I have rates from Hanjin and I think we can save you about 100- 200 per container  from what you were paying WLG...
Also I will give you rates from POS and Matson..I am positive there will be substantial savings too!!


Have a nice weekend !!
Best Rgds
Scott

---

**From:** ▌exquisiteapparel.com [mailto:▌exquisiteapparel.com]
**Sent:** Friday, April 01, 2011 12:09 PM
**To:** Scott
**Subject:** RE: Chennai Rates

Scott,

▌ advised that you called.  We are looking at the rates and we have good rates from a lot of forwarders.  Please give me a chance to get back to you by the last week of April.

Regards,

▌

---

**From:** Scott [mailto:Scott@stileintl.com]
**Sent:** Wednesday, March 30, 2011 9:21 AM
**To:** ▌
**Cc:** Milton Heid
**Subject:** Chennai ▌

▌

Thank you for taking the time to meet us yesterday

I have checked with overseas and I am pleased to offer you ocean rates from Chennai to Lax



I am working on the Shanghai rates and will revert to you next week!

Did you need any other ports in India ?
Did you need rates from Bangladesh?

Thank you again

Rgds
Scott


Scott Turner
President of USA Logistics
181. South Franklin Ave, 4th Floor
Valley Stream, NY 11581
Email :Scott@stileintl.com
Phone:516-394-2126
www.stileintl.com

The preceding email message (including any attachments) contains
information that may be confidential. It is intended to be conveyed
only to the designated recipient(s). If you are not an intended
recipient of this message, please notify the sender by replying to this
message and then delete it from your system. The statements and
opinions expressed in this email are my own and may not represent those
of Exquisite Apparel. Use, disclosure, distribution or reproduction of
this message by unintended recipients is not authorized and may be
unlawful.

The preceding email message (including any attachments) contains
information that may be confidential. It is intended to be conveyed
only to the designated recipient(s). If you are not an intended
recipient of this message, please notify the sender by replying to this
message and then delete it from your system. The statements and
opinions expressed in this email are my own and may not represent those

of Exquisite Apparel. Use, disclosure, distribution or reproduction of
this message by unintended recipients is not authorized and may be
unlawful.

This email message and any attachments may contain information that is confidential to
WLG INC., its subsidiaries or affiliates. If you are not the intended recipient you cannot
use, distribute or copy the message or attachments. In such a case, please notify the
sender by return email immediately and erase all copies of the message and attachments.
Opinions, conclusions and other information in this message and attachments that do not
relate to the official business of WLG INC., its subsidiaries or affiliates are neither given
nor endorsed by it.

This email has been scanned by the MessageLabs Email Security System.

**EXHIBIT F**

# K&L|GATES

K&L Gates LLP
70 West Madison Street
Suite 3100
Chicago, IL 60602-4207

T 312.372.1121    www.klgates.com

March 8, 2011

VIA CERTIFIED AND OVERNIGHT MAIL

Scott Turner
15 Caumsett Farms Lane
Woodbury, NY 11797

Dear Mr. Turner:

We are counsel for World Commerce Services, LLC d/b/a WLG USA, LLC ("the Company"). The purpose of this letter is to demand that you immediately cease and desist from conduct that breaches the Non-Competition and Non-Solicitation provisions contained in the enclosed Employment Agreement, and which may violate other state and federal law.

As you are aware, in your Employment Agreement you agreed, among other things, that:

- For a 12 month period following the Term of the Agreement, not to act as an employee, agent, owner, partner, consultant, independent contractor, representative, stockholder, or in any other capacity in any business that offers products and services competitive with those of the Company (Para. 9.2(a));

- For an 18 month period following the Term of the Agreement, you may not entice, solicit or encourage any Company employees to leave the employ of the Company (Para. 9.2(b));

- During the Term of the Agreement and for an 18 month period thereafter, you may not, directly or indirectly, entice, solicit or encourage any current or prior customer or prospective customer of the Company to cease doing business with the Company, reduce its relationship with the Company... or do any business with any other entity (Para. 9.2(c)).

In your Employment Agreement, you further agreed that these provisions are reasonable and necessary, and that any breach thereof would cause the Company to suffer irreparable harm, which would entitle it, among other things, to seek and obtain injunctive relief against you. (Para. 10). You further agreed to pay the Company's attorneys fees and costs in any legal action, including one seeking equitable and/or monetary relief from you. (Para. 16). Your March 4 termination letter, which was hand-delivered to you last Friday, reminded you that

C-629155 v2

K&L|GATES

Scott Turner
March 8, 2011
Page 2

these provisions of the Employment Agreement remained binding following the termination of your Employment Agreement (copy enclosed).

The Company has learned that, during your employment with the Company, you established a business that offers products and services competitive with those of the Company.

Moreover, following the termination of your Employment Agreement last Friday, March 4, 2011, you repeatedly contacted several Company employees for the purpose of enticing, soliciting or encouraging them to join you at a competitive business you had already established. You continued to contact these employees yesterday throughout the business day, urging them to join you at your newly-formed competitive business.

It is the Company's policy and practice to enforce its restrictive covenants and protect its trade secrets and confidential information. You have violated the Employment Agreement, your fiduciary duties to the Company, and may have violated other state and federal laws. Currently, the Company is assessing the damage you caused to its systems by downloading and accessing internet-based materials and websites, which resulted in over two million (2,000,000) infected files in your Company-provided computer and the replacement of an entire computer hard drive.

If I do not hear from you or your counsel by the close of business on Friday, March 11, 2011 regarding how you intend to conduct yourself on a going-forward basis to ensure that no further breaches or statutory violations will occur, and how you and others will remedy the Company for the harm you have already caused, the Company will be left with no alternative but to file suit against you for injunctive relief, compensatory damages, and any other damages allowed to the fullest extent of the law, and all costs and attorneys' fees, in addition to all other remedies.

Very truly yours,

*Melissa A. Siebert*

Melissa A. Siebert

Enclosures

# K&L|GATES

K&L Gates LLP
70 West Madison Street
Suite 3100
Chicago, IL 60602-4207

T 312.372.1121      www.klgates.com

March 9, 2011

Melissa A. Siebert
D 312.807.4270
F 312.827.8008
melissa.siebert@klgates.com

**VIA OVERNIGHT DELIVERY**
Joanne Reicherter
627 S. Bayview Ave
Freeport, NY  11520

Dear Ms. Reicherter:

We are counsel for World Commerce Services, LLC d/b/a WLG USA, LLC ("the Company"). This letter serves to advise you that the Company has withdrawn and declared null and void the Separation Agreement and Release that was hand-delivered to you on March 4, 2011. The Company is taking this action because you have since breached the surviving provisions of your May 1, 2009 Employment Agreement.

As you are aware, in your Employment Agreement, which was a material condition of your employment, you agreed, among other things, that:

- For a three (3) year period following the end of your employment, you would not "directly or indirectly: (a) solicit any of Company's U.S. customers or overseas agents for freight forwarding business; (b) disclose the names of any such customers or overseas agents to any other person or entity…." (Employment Agreement, Paragraph 7); and

- The Company's confidential information and trade secrets "have been developed by Company over a number of years at great expense, are not readily available to or ascertainable by the freight forwarding industry generally, and have been kept secret and divulged to employees only on a need-to-know basis." (Employment Agreement, Paragraph 3); and

- You would not ever "directly or indirectly disclose any of Company's trade secrets or other confidential information." (Employment Agreement, Paragraph 6).

Since your termination, the Company has learned that you have breached these provisions of your Employment Agreement by using the Company's confidential information and trade secrets to solicit Company customers such as GGSI, and that you have disclosed these customers' identities and other information to your new employer.

The Separation Agreement and Release was in consideration for, among other items, your reaffirming and confirming your ongoing obligations under your Employment Agreement, including the obligation not to use the Company's trade secrets or confidential information,

C-629241 v1

K&L|GATES

Joanne Reicherter.
March 9, 2011
Page 2

and not to solicit its customers (See, Para. 9, Separation Agreement and Release). Because you have breached these obligations, the Company will not be paying you any separation pay and will not be entering into a Separation Agreement and Release with you.

The Company additionally demands that you immediately cease and desist any/all conduct that violates your Employment Agreement. As you well know, it is the Company's policy and practice to enforce its restrictive covenants and to protect its trade secrets and confidential information. You are in breach of your contractual commitments. As a result, you, and anyone else benefiting from your actions could well be exposed to substantial liability, including but not limited to injunctive relief, monetary damages, and any other damages available to the fullest extent of the law, and the payment of all of the Company's attorneys' fees and costs.

Without prejudice to the Company's position, I expect to hear from you or your counsel no later than Friday, March 11, 2011 regarding how you intend to conduct yourself on a going-forward basis to ensure that no further breaches or statutory violations will occur, and how you and others will remedy the Company for the harm you have already caused.

If no satisfactory response is forthcoming, the Company will be forced to file suit and to pursue injunctive relief, compensatory and any other damages available under the law, and attorneys fees and costs, in addition to all other remedies.

Very truly yours,

*Melissa A. Siebert*

Melissa A. Siebert

# K&L|GATES

K&L Gates LLP
70 West Madison Street
Suite 3160
Chicago, IL 60602-4207

T 312.372.1121    www.klgates.com

March 9, 2011

Melissa A. Siebert
D 312.807.4270
F 312.827.8008
melissa.siebert@klgates.com

**VIA OVERNIGHT DELIVERY**
Joanne Zambuto
627 S. Bayview Ave
Freeport, NY 11520

Dear Ms. Zambuto:

We are counsel for World Commerce Services, LLC d/b/a WLG USA, LLC ("the Company"). This letter serves to advise you that the Company has withdrawn and declared null and void the Separation Agreement and Release that was hand-delivered to you on March 4, 2011. The Company is taking this action because you have since breached the surviving provisions of your October 12, 2009 Employment Agreement.

As you are aware, in your Employment Agreement, which was a material condition of your employment, you agreed, among other things, that:

- For a two (2) year period following the end of your employment, you would not "directly or indirectly": "(a) solicit or accept business from any of Company's or its affiliates' U.S. customers or overseas agents"; "(c) use or disclose the names of any of the Company's or its affiliates' customers or overseas agents to any other person or entity...."; or "(e) solicit or attempt to solicit any customer, supplier, vendor, or contractor of Company and/or its affiliates, to terminate or disturb their relationships or business with the Company and/or its affiliates" (Employment Agreement, Paragraph 7); and

- The Company's confidential information and trade secrets "have been developed by Company and its affiliates over a number of years at great expense, are not readily available to or ascertainable by the freight forwarding industry generally, and have been kept secret and divulged to employees only on a need-to-know basis." (Employment Agreement, Paragraph 3); and

- You would not ever "directly or indirectly use or disclose any of Company's and its affiliates' trade secrets or other confidential information." (Employment Agreement, Paragraph 6).

Since your termination, the Company has learned that you have breached these provisions of your Employment Agreement by using the Company's confidential information

# K&L|GATES

Joanne Zambuto
March 9, 2011
Page 2

and trade secrets to solicit Company customers such as GGSI, and that you have disclosed
these customers' identities and other information to your new employer.

The Separation Agreement and Release was in consideration for, among other items, your
reaffirming and confirming your ongoing obligations under your Employment Agreement,
including the obligation not to use the Company's trade secrets or confidential information,
and not to solicit its customers (See, Para. 9, Separation Agreement and Release).  Because
you have breached these obligations, the Company will not be paying you any separation pay
and will not be entering into a Separation Agreement and Release with you.

The Company additionally demands that you immediately cease and desist any/all
conduct that violates your Employment Agreement.  As you well know, it is the Company's
policy and practice to enforce its restrictive covenants and to protect its trade secrets and
confidential information.  You are in breach of your contractual commitments.  As a result,
you, and anyone else benefiting from your actions could well be exposed to substantial
liability, including but not limited to injunctive relief, monetary damages, and any other
damages available to the fullest extent of the law, and the payment of all of the Company's
attorneys' fees and costs.

Without prejudice to the Company's position, I expect to hear from you or your counsel
no later than Friday, March 11, 2011 regarding how you intend to conduct yourself on a
going-forward basis to ensure that no further breaches or statutory violations will occur, and
how you and others will remedy the Company for the harm you have already caused.

If no satisfactory response is forthcoming, the Company will be forced to file suit and to
pursue injunctive relief, compensatory and any other damages available under the law, and
attorneys fees and costs, in addition to all other remedies.

Very truly yours,

*Melissa A. Siebert*

Melissa A. Siebert

**EXHIBIT G**

**From:**    Scott Tepper
**Sent:**    Tuesday, April 12, 2011 2:47 PM
**To:**      Alisha Gager - WLG - Chicago
**Subject:** FW: Stile Associates


-----Original Message-----
From: stevenheid@stileintl.com [mailto:stevenheid@stileintl.com]
Sent: Tuesday, April 12, 2011 12:01 PM
To: Scott Tepper
Cc: Scott Turner
Subject: Stile Associates

Hi Scott,

It was very nica speaking to you on the phone. As discussed, below is my contact info., please keep us in mind for your air shipments as well as the occasional ocean container moves that you use forwarders for.

Also, I know you are currently bappy with your broker, but please keep us in mind. I would be more than happy to do 5 entries for free so that you can compare our service with your current broker.  Thereafter, I would be willing to handle your entries far an all inclusive flat fee of $110.00.

We are fully automated and offer Stile Link which will allaw you ta see your entries live time clearance with U.S. Customs. We can also set you on our automatic email release program. The system will automatically send you and email live time once your shipment is released.

As far as credit I have no problem extending you terms. Please check out my website at www.StileIntl.com where you can view a 5 minuta video on Stile Associates.

Thanks,
Steven Heid
Vice President
Tel:(516)394-2108
Fax:(516)394-2195
Please view our cooperate video at www.StileIntl.com




181 S. Franklin Ave
Valley Stream, N.Y. 11581 Suite 4
Please view our cooperate videa at www.StileIntl.com

**EXHIBIT H**

**From:** ████exquisiteapparel.com [mailto: ████@exquisiteapparel.com]
**Sent:** Thursday, April 14, 2011 10:18 AM
**To:** Allen Quinn - WLG - New York
**Subject:** FW:

FYI

---

**From:** Scott [mailto:Scott@stileintl.com]
**Sent:** Wednesday, April 13, 2011 3:58 PM
**To:** ████
**Cc:** JoMarie; JoAnne; Milton Heid
**Subject:** FW:

Hi ████

Please find attached our rates from Shanghai to Lax and Ny

Best Rgds
Scott Turner

The preceding email message (including any attachments) contains information that may be confidential. It is intended to be conveyed only to the designated recipient(s). If you are not an intended recipient of this message, please notify the sender by replying to this message and then delete it from your system. The statements and opinions expressed in this email are my own and may not represent those of Exquisite Apparel. Use, disclosure, distribution or reproduction of this message by unintended recipients is not authorized and may be unlawful.

This email message and any attachments may contain information that is confidential to WLG INC., its subsidiaries or affiliates. If you are not the intended recipient you cannot use, distribute or copy the message or attachments. In such a case, please notify the sender by return email immediately and erase all copies of the message and attachments. Opinions, conclusions and other information in this message and attachments that do not relate to the official business of WLG INC., its subsidiaries or affiliates are neither given nor endorsed by it.

This email has been scanned by the MessageLabs Email Security System.